## BENZ et al. v. CELESTE FUR DYEING & DRESSING CORPORATION et al.

District Court, S. D. New York.

Nov. 10, 1944.

896

Mock & Blum, of New York City, for plaintiffs.

Bergner & Bergner, of New York City (Alexander Mencher and Daniel L. Morris, both of New York City, of counsel), for defendants.

RIFKIND, District Judge.

Plaintiffs are the owners of Calva's Patent No. 2,240,388, issued April 29, 1941, on a divisional application filed February 24, 1941. The parent application was filed October 19, 1936. The plaintiffs brought suit at law for damages resulting from the alleged infringement by defendants of claims 1, 2, 3, 5, 10 and 13. These claims, so far as they are pertinent here, relate to a method of treating sheepskins so as to permanently straighten the wool hair, and thus to simulate more expensive furs. The issues of validity and infringement were tried to a jury which found all the claims in issue valid and infringed and awarded the plaintiffs damages of $13,918.-50. A previous trial had likewise resulted in a verdict and judgment for plaintiff. This was reversed and remanded. 136 F.2d 845, 848.

Defendant moved for a directed verdict and decision thereon was reserved. The chief issue presented by this motion is whether plaintiffs are entitled to the benefit of the earlier filing date of the parent application. This issue is critical for the following reasons: The process employed by defendants involves the use of formaldehyde and an acid catalyst but not the use of cresol. A public use by Laskin & Company of the process employed by defendants occurred as early as October, 1937,[1] or more than two years prior to the filing of the application for the patent in suit but after the filing of the parent application.

On the record made at the first trial the Court of Appeals broadly intimated that a verdict should have been directed for

---

[1] Calva testified that Nelson was connected with a subsidiary corporation of Laskin and Sons Co.; that he met Nelson in March or April of 1936, and told him about his product and that it was desirable, but that he did not show him how to make the product; that he sent him a bottle of acidulated formaldehyde to apply to sheepskins partially treated by Calva; that in the Spring of 1938, he obtained about a one square inch of material produced by Laskin which he tested to his heart's content. He later testified that the one square inch of sheepskin had been given by Nelson to Benz, the co-plaintiff.

Benz testified that he saw Nelson at the Nelson plant in October, 1937 and he definitely fixed that date by reference to a trade convention which he attended at the time. Nelson showed him through the plant. There was no evidence of any other meeting between Benz and Nelson, when the former could have obtained the sample of sheepskin he gave to Calva. Weiss, the president of the corporate plaintiff, testified that Laskin's product appeared on the market in late 1937 or early 1938. From these several items of evidence I have deduced that plaintiffs knew of Nelson's product and process at or about October, 1937.

the defendants. It remanded for a new trial "to the end that injustice may not be done" for the reasons that (1) the pleadings did not adequately warn the plaintiffs of this issue; (2) the character of the interference proceedings and the relations between plaintiffs and Laskin were not made clear; and (3) the complete file wrapper was not before the court.

■ The Court of Appeals also stated the rule governing the principal issue:

"It is true that cases, cited by plaintiffs, hold that, if an applicant, while his application is pending, discovers new uses to which his invention can be put, he may properly amend to omit a non-essential in the process originally disclosed by him, provided that he shows that the amendments involved 'something that might be fully deduced from the original application', and that they do not broaden the patent to 'interfere with other inventors who have entered the field in the meantime' or 'appropriate that which has, in the meantime, gone into public use.' * * There is doubt, on the evidence in this record, whether Calva comes within the doctrine of those cases."

The question is whether the present record resolves that doubt. The file wrapper of the parent application shows that originally Calva included broad claims not calling for the use of cresol. These were rejected by the Patent Office as reading on the prior art. Of the claims that remained, three called for the use of cresol or other hydroxy aromatic compound. Two other claims survived which are not relevant to the present issue. This official action took place on June 23, 1937.

By an amendment dated December 7, 1937 (received by the Patent Office December 20, 1937), that is, after plaintiffs had knowledge of the Laskin use, Calva cancelled several claims and added 22 claims. None of these new claims recited the use of formaldehyde and acid without cresol or other hydroxy aromatic compound. By this amendment Calva also changed the reference to cresol, which in Example I of the original application had been described as "most important," to "useful."

On April 11, 1938, the Patent Office rejected all claims except those which it had indicated as allowable in its action of June 23, 1937. On April 13, 1938, the Patent Office suggested to Calva, for purposes of interference, several claims from the Nelson application filed November 9, 1936. Two of these claims read:

"Fur the hair of which is combined with formaldehyde, thereby being rendered water-proof and straight instead of kinky.

"The process of unkinking natural wool which comprises subjecting the same to the action of formaldehyde in an acid medium."

These two claims, which make no reference to cresol, were adopted by Calva on May 3, 1938. But these claims, as the Court of Appeals pointed out, are not equivalent to the claims in suit which did not come into the application until February 24, 1941.

In the interference proceedings which ensued between Calva and Nelson, the former prevailed. The examiner reported that Calva had testified that he had disclosed the invention to Nelson but the examiner concluded that the evidence was insufficient to justify a finding that Nelson derived from Calva. This decision was made on December 23, 1941, and was affirmed by the Board of Appeals on July 21, 1942.

Upon the present trial Calva gave no evidence that he had disclosed his invention to Nelson—who, it should be noted, was president of a subsidiary of Laskin and Co., and for present purposes is to be regarded as identical with Laskin.

To conclude the history of the parent application, on September 22, 1942, the Patent Office rejected all its claims except the two which had been suggested by the Patent Office out of Nelson's application and with respect to these the action of the Patent Office remained unchanged.

Upon the present trial Calva testified,

"Q. Up to the time you filed your application on which the patent was issued, when you used formaldehyde and an acid catalyst, you also used cresol along with it? A. Yes, I did."

If Calva is to be taken at his word he must be deemed to have admitted that until February 24, 1941, when the application for the patent in suit was filed, he had not yet experimented with acidulated formaldehyde in the absence of cresol. Nor can his answer be regarded as a slip and that he intended a date prior to the filing of his parent application, for his attention was expressly directed by examining counsel to the meaning of the phrase "up to the time you filed your application on which the patent was issued" as

indicating February, 1941. Moreover, on reexamination by his own counsel, he did not attempt to correct this answer as springing from misunderstanding but he did undertake to modify the answer. His modification consisted of recalling that on March 23, 1937, he made a test in which he omitted cresol but used cresolsulphonic acid. He did not testify that the test was successful nor was there any corroboration of this experiment. It had not been mentioned before despite vigorous effort to elicit from him when he first learned that he could dispense with cresol.

To summarize: When Calva filed his parent application he believed and taught that cresol was most important to his process. That was October 19, 1936. In October, 1937, Laskin and Co. made public use of a cresolfree process and Calva learned of it at or about that time. On or about December 7, 1937, Calva amended "most important" to "useful" in his description of cresol; but it does not follow that Calva then disclosed the optional use of cresol. His testimony tends rather to indicate that of the various hydroxy aromatic compounds he regarded cresol as useful. He volunteered thus:

"I just wanted to say that it is a fact, an undeniable fact that in the parent application I was—that of the reacting substances which I had given in Example I cresol is a hydroxy aromatic compound and is the most important."

Down to February 24, 1941, he had not yet even experimented with acid and formaldehyde in the absence of cresol or other hydroxy aromatic compound. And the plaintiffs' expert testified that a reading of the patent in suit did not teach him that he could dispense with cresol. (By stipulation only Example I is relied upon.)

■ The claims in suit do not by their terms call for the use of cresol; but if construed so as not to make cresol mandatory they are invalid by reason of the public use by Laskin and Co. in 1937; and there is nothing in the parent application which teaches the use of an acid and formaldehyde without cresol.

Plaintiffs rely on the broad claims of the parent applications, Cinema Patents Co., v. Warner Bros. Pictures, D.C., E.D. N.Y.,1932, 55 F.2d 948; but these cannot serve the plaintiffs for not only were the original broad claims rejected as reading on the prior art, but it is clear that at the time of the filing of the parent application Calva had not yet learned of a cresol free process involving formaldehyde and acid. I place no credence at all in his eleventh hour attempt to blame his attorney for the form of expression ascribing to cresol a "most important" role in the process. Moreover, regardless of what he knew, he certainly did not teach such a process. United States Industrial Chemicals v. Carbide and Carbon Chemicals Corp., 1942, 315 U.S. 668, 62 S.Ct. 839, 86 L.Ed. 1105.

Plaintiffs contend that there was such a disclosure and rely on language describing the chemical mechanism as analagous to synthetic resin formation in which "the active chemical functional groups of the parent substance of the filaments act as one of the condensation re-agents, while the other is supplied according to requirements." The use of the singular is emphasized by the plaintiffs. Similar expressions occur elsewhere in the patent. Among the ten reactions listed in the specification are some, such as 6 and 7, which make no reference to cresol. But these do not aid the plaintiffs. Whatever may be the description of the final chemical reaction, it does not show a process whereby that chemical reaction can be made to operate. In order to understand the operation we must turn to Example I, the only one relied on by the stipulation and that Example teaches the use of cresol. It makes little difference whether Calva so taught because he believed it to be a necessary ingredient of the chemical reaction, or as a tanning agent, as he claimed upon this trial, or as a wetting agent, as his expert testified.

Moreover, in a number of places Calva used the plural in referring to reactants as in page 3, column 2, lines 10 and 15. As to the chemical mechanism he used the phrase, "I react the wool with a hydroxy aromatic compound, such as cresol," page 3, column 2, line 18. At the trial he testified that no such chemical reaction took place. I mention these only to indicate that no reliance can be placed on such excerpted phrases taken out of context.

■ I conclude that defendant was entitled to a directed verdict because even if the patent in suit makes cresol optional, the parent application surely made it mandatory, and, therefore, the patent in suit is not entitled to the filing date of the

parent application but only to its own filing date which is more than two years after a commercial public use of the allegedly infringing process. In view of this disposition it is unnecessary to consider the many other defenses or grounds for the motion advanced by the defendant.

Defendants, by their amended answer, pleaded a counterclaim for injunctive relief and for damages caused by plaintiffs' unlawful conduct in violation of the Anti-Trust Act, 15 U.S.C.A. § 1 et seq. The issues raised by this counterclaim and reply thereto were tried to the court without a jury. The allegations of fact necessary to sustain this counterclaim have not been proved. The evidence does not show that plaintiffs knew the patent was invalid and that, so knowing, they sued defendant and threatened to sue defendants' customers. Nor can a combination in restraint of trade be predicated solely on a proposed form of license agreement not shown to have been executed. The counterclaim is, therefore, dismissed.