**LARSEN PRODUCTS CORPORATION, a Maryland corporation, and Phyllis H. Larsen,**

v.

**PERFECT PAINT PRODUCTS, INC., a Delaware corporation,**
**and**
**Sta-Dri, Inc.**
**and**
**American Sta-Dri Company, Inc., Intervenor.**

**Civ. No. 10916.**

United States District Court
D. Maryland.

Feb. 10, 1961.

Supplemental Opinion Feb. 24, 1961.

John D. Alexander, Constable, Alexander & Daneker, Baltimore, Md., and Roberts B. Larson, Larson & Taylor, Washington, D. C., for plaintiffs.

Emanuel H. Horn, Baltimore, Md., and Karl W. Flocks, Washington, D. C., for defendants.

THOMSEN, Chief Judge.

This is a patent infringement suit, in which the usual issues of prior art, public use and infringement are complicated by plaintiffs' frequent change of position on what the invention really was.

Briefly, the case is this. Before 1949 Larsen discovered that a polyvinyl acetate emulsion,[1] of the type then being sold as a library adhesive, could be used to bind plaster to a smooth surface, such as a wall or ceiling, simply by brushing the emulsion onto the surface, allowing it to dry until it formed a film, and then applying the wet plaster onto the film. The film so developed was water permeable, and it was this quality which made

---

1. Except when quoting directly from the patent or other papers, polyvinyl acetate will be abbreviated to PVA, polychlorinated diphenyl to PCDP, tricresyl phosphate to TCP, and hexylene glycol to HXG. Some exhibits refer to chlorinated diphenyl, herein abbreviated to CDP, which has been treated by both sides as equivalent to PCDP for the purposes of this case.

it a suitable bonding agent. The process was used experimentally in 1949 and publicly in 1950. Early in 1951, Larsen sold a PVA emulsion, labeled "Plaster-Weld", for public use in Washington, D. C. However, he never made any claim for a process or a structure. In the latter part of 1951 Larsen and Groome added certain plasticizers to the composition, primarily to make it more flexible. The particular plasticizers used were indicated by the prior art. In April 1952 Larsen and Groome filed an application for a patent for their composition, and two narrow composition claims were allowed by the Patent Office in 1953, shortly after Larsen's death. In 1954 his administratrix filed an application including process and structure claims, and both the administratrix and Groome made oath that Larsen was the sole inventor of the process. Later, they claimed that Larsen and Groome jointly invented the process, and a single patent (the patent in suit) was issued including structure, composition and process claims. These claims include "drying the film" as an element. Plaintiff now relies strongly on this element, although many specifications, disclosures, instructions, advertisements and briefs, before and after the issuance of the patent, have asserted or otherwise indicated that the invention rested on other grounds, and that it is only necessary to allow the emulsion to dry sufficiently to form a film. The process and structure claims are invalid because of prior public use more than one year before the application for the patent, and the composition claims are invalid because the essential facts had been known and essentially similar compositions had been used publicly for more than a year before April 11, 1952, and the claimed improvements would have been obvious in 1950 and 1951 to a person having ordinary knowledge and skill in the adhesive art.

### Facts

#### The Patent in Suit

The patent in suit, No. 2,760,885, issued to Phyllis H. Larsen, as assignee of said Phyllis H. Larsen, administratrix of Herbert J. Larsen, deceased, and George G. Groome, on August 28, 1956, shows the application date as April 14, 1954. The patent states:

"This invention relates to a process for bonding hydraulic cementitious materials to base materials * * * The invention is further directed to the laminated structure resulting from the use of the method of plastering described herein. * * *

"The present invention is directed to the method of applying plaster whereby the plaster is interlocked with the base material through the intermediary of the bonding agent. * * *

"The presently described process contemplates the use of a novel bonding agent described and claimed in applicants' co-pending application, Serial No. 281,914, filed April 11, 1952, for 'Bonding Adhesives, Particularly for Bonding Hydraulic Cementitious Materials', now abandoned. This bonding agent is an aqueous emulsion of the polyvinyl acetate resins which are compounded with additional agents to produce the bonding material suitable for use in the presently described process.

"One of the outstanding features of the present invention is the use of a special bonding agent which permits the plaster to be applied at any time after the application of the bonding agent to the base material even if the bonding agent has dried out. In methods employed heretofore it was essential to apply plaster immediately after the application of the asphalt emulsion * * *.

"It has now been discovered that polyvinyl acetate emulsions have remarkable properties for use as bonding agents in the practice of our invention. These emulsions do not oxidize as do the asphalt emulsions. Moreover, the deposited solids of these emulsions readily re-emulsify when brought into contact with water, as, for example, when wet gypsum plaster is applied to a base structure covered with such deposited solids, essentially polyvinyl acetate.

"While the invention embraces broadly the use of such polyvinyl acetate emul-

sions and, as such, is entirely operative, it has been found that the addition of plasticizers and the like is beneficial.

"One bonding agent found suitable for use in the present invention is an emulsion of polyvinyl acetate resin with the addition of plasticizing agents including polychlorinated diphenyl, tricresyl phosphate, and hexylene glycol."

A suitable composition (similar to the one in Claim 3) is then discussed, after which the patent states:

"The method of applying plaster according to the present invention is as follows: The base material which may be any of the building materials presently used need not be prepared in any way and may, in fact, be either damp or dry when bonding agent is applied. The bonding agent is then sprayed or brushed over the base surface to be covered and forms a film thereon. The hydraulic cementitious material, such as Portland cement or gypsum plaster, is then applied over the film. The plastering may be delayed for any desired length of time after applying the film of bonding agent. This is due to the fact that a film of bonding agent itself is redispersible and will re-emulsify after having dried out. * * *

"However, while it is believed that enhanced adhesiveness is due to this 'interlocking' of plaster and emulsion film, the invention is not to be limited to this theory.

"As stated above, the bonding agent may consist simply of the commercially available polyvinyl acetate emulsions. Advantageously, however, plasticizers such as those referred to above are also present.

"While the utility of this invention in bonding base structural materials such as concrete slabs, wood, and steel to finish coatings of hydraulic cementitious materials has been emphasized, it is obvious that the presently described process is applicable in other fields as well, for example, in bonding wood to wood."

Claim 1 reads: "A laminated structure comprising a base material, a coating

thereon comprising a film composed of the solids deposited from an aqueous emulsion of a polyvinyl acetate, said solids being re-emulsifiable, and a set hydraulic cementitious material overlying and adhering to said coating."

Claims 2 and 3 are composition claims. Claim 2 reads: "An adhesive composition comprising about 100 parts by weight of an aqueous emulsion of a polyvinyl acetate resin, about 4 to 12 parts by weight of a polychlorinated diphenyl, about 4 to 12 parts by weight of tricresyl phosphate and about 2 parts by weight of hexylene glycol, said composition, when applied as a coating and allowed to dry, yielding a water permeable film." Claim 3 is similar to Claim 2 except that it is more specific with respect to the amounts of polychlorinated diphenyl, and tricresyl phosphate, each of which are stated to be "about 8 parts by weight".

Claims 4 to 8 are process claims. Claim 5 reads: "The process of applying a hydraulic cementitious material which comprises coating a base material with a film of an aqueous emulsion of polyvinyl acetate the deposited solids of which will re-emulsify in contact with water, drying the film, and thereafter re-emulsifying the polyvinyl-acetate film by applying an aqueous mixture of hydraulic cementitious material thereto."

Claim 4 is similar except that the film is stated to be a "film of aqueous emulsion of resin the deposited solids of which will re-emulsify in contact with water, the aqueous emulsion of resin comprising about 100 parts by weight of an aqueous emulsion of a polyvinyl acetate resin, about 8 parts water by weight of a polychlorinated diphenyl, about 8 parts by weight of tricresyl phosphate, and about 2 parts by weight of hexylene glycol."

Claim 6 is the broadest process claim. It is generally similar to claim 5 except that the film is "composed essentially of an aqueous emulsion of polyvinyl acetate, the deposited solids of which will re-emulsify in contact with water, * * ."

Claim 7 is similar to Claim 5 except that "an aqueous emulsion of polyvinyl

acetate and hexylene glycol" is specified rather than polyvinyl acetate alone.

Claim 8 is like Claim 7, except that tricresyl phosphate as well as hexylene glycol is included among the ingredients of the emulsion.

Each of the process claims includes "drying the film", or "permitting the film to dry".

### The Parties

Plaintiff, Phyllis H. Larsen, is the owner of the patent in suit, and is president of the other plaintiff, Larsen Products Corporation, which at the date of suit was a licensee under the patent. Defendants Sta-Dri, Inc., American Sta-Dri Company, Inc., and Perfect Paint Products, Inc., are engaged in business in Maryland and were, at the date of suit, respectively the manufacturer, distributor and retail seller of a product known as Link, the manufacture and sale of which, with instructions for use thereof, are charged to infringe the patent. The court has jurisdiction over the parties and of the cause.

### Prior Art

Before the development of the PVA emulsions no satisfactory method of applying plaster to smooth wall and ceiling surfaces was known. It was customary to place lath or screening over the surface, or to score or roughen the surface in order to provide a physical interlock for the plaster. Glues, pastes and other adhesives had been known for centuries and used for many purposes, but no one had ever used them successfully for binding plaster to a smooth surface.

Some time before World War II, PVA *solutions* were developed. Between 1938 and 1947 a number of patents were issued for different types of bonding agents, including a PVA solution which dried to form a film, latex and other elastomers.[2]

During the War PVA *emulsions* were developed, and after the War they began to supplant PVA solutions and other types of adhesives for library use and for various purposes in the building field.[3] In 1943 the Government Printing Office began a study of various synthetic resins in a search for satisfactory substitutes for the glues theretofore used in the bindery. George G. Groome, one of the patentees of the patent in suit, participated in that investigation, which led to the development of several resinous adhesive formulas employing as the principal constituent a water emulsion of PVA. It was found that this emulsion exhibited excellent adhesive qualities, but dried out into a hard, brittle film. Experiments revealed that adding a softening agent or plasticizer to the PVA emulsion in an amount equivalent to 8% of the total weight of the emulsion, produced dry, resinous films, permanently flexible and ideally suited for padding and notebook work. In 1947 Groome and Kantrowitz published GPO-PIA Joint Research Bulletin B–4, entitled "Miscellaneous Bookbinding Adhesives", reciting the foregoing facts and setting out a number of formulas in which various plasti-

2. In 1938 Patent No. 2,110,885 was issued to Lytle for a glass brick wall formed by coating the abutting edges of the bricks with a bonding material which adhered firmly to mortar and cement; the bonding agent disclosed was a PVA solution which dried to a film. In 1942 Patent No. 2,294,247 was issued to Smith for a surface covering in which a layer of latex was placed between the base surface and the cementitious wearing surface. Smith evidently relied for adhesion on the tackiness of the latex film. In 1947 Patent No. 2,422,665 was issued to Fredrickson for a "barrier and bonding layer"—a soft, synthetic elastomer—to be used with Sorel's cement. Fredrickson's suggested elastomer was re-emulsifiable, in the sense in which that word is used in the patent in suit, see Note 7, infra, but it does not appear that Fredrickson relied upon that quality for its effectiveness as a bonding agent.

3. In 1945 Patent No. 2,387,967 was issued to Zimmerman for a tabbing cement, consisting of a PVA emulsion with appropriate plasticizers added, for cementing the edge of a block of paper to form a tablet or pad.

cizers were used to achieve particular results.[4]

A great deal of information about PVA emulsions became common knowledge immediately after the War, and DuPont and other chemical companies sold PVA emulsions under various trade names and numbers. Some were simple PVA emulsions, but most were plasticized with one or more plasticizers, the names of which were not always disclosed, and could not ordinarily be determined by chemical analysis. Other chemical companies sold various plasticizers, including TCP, (P)CDP and HXG,[5] which were known to give certain desirable characteristics, such as flexibility and fire resistance, when used in connection with PVA emulsions. Much information about PVA emulsions and specific plasticizers was included in catalogs and bulletins issued by chemical companies.[6]

It was known before 1950 that the film resulting from a PVA emulsion had a tendency to re-emulsify or disintegrate if brought into contact with water. On April 6, 1950, Kunze and Evans applied for a patent for PVA emulsions suitable for use as coatings and adhesives. They were particularly concerned with emulsions which were capable of producing a water resistant bond. Patent No. 2,588,-543, issued to them on March 11, 1952, included several specific composition claims. More importantly, for the purposes of this case, it contained a great deal of information about various plasticizers, citing numerous examples in which CDP, TCP and HXG, by then well-known, were used in various combinations, and taught that two parts in weight of HXG would begin to give a water proof or water resistant character to the composition. The patent was dedicated to the public by its assignee Du-

Pont on September 21, 1954. At least as early as March, 1952, the representatives of DuPont, Monsanto and other chemical companies were fully aware of the mass of information set out in the Kunze and Evans patent.

## Larsen's Process and Public Use Thereof before April, 1951

During the period from 1945 through the first half of 1951, Herbert J. Larsen was in the business of selling stationers' specialties, including library adhesives. He also had some knowledge of plasters and plastering. As early as 1945 he conceived the idea of using a library adhesive to bind plaster to a smooth surface. His preliminary experiments were encouraging, and not later than 1949 he had an opportunity to have the process tested by use in the apartment building in which he lived. A repair man applied the liquid coating, let it dry sufficiently to form a film, and then applied the plaster, which remained securely in place. Also in 1949, Larsen learned that the owners of the Wardman Park Hotel wished to redecorate the entire hotel and were interested in the problem of applying plaster on Kraftex walls covered with several coats of paint. He persuaded the owners and the contractor to experiment with his new process, and to use the library adhesive which he selected for the purpose. They refinished one wing of the Wardman Park Hotel in 1949. After one year the plaster was still firm, the management was satisfied, and in 1950 they purchased from Larsen (directly or through a building supply company) enough adhesive to refinish the entire hotel. The adhesive used was a compound containing a PVA emulsion of the general class of Elvacet 81–900, made and sold by DuPont for stationers' use. The use of the process on the one wing in 1949 was experimental, but its use in

---

4. The authors reported that the incorporation of small amounts of any of several plasticizers, including HXG, into a PVA emulsion "produces a very good bookbinding adhesive which remains flexible upon drying of the adhesive film."

5. See Note 1, supra.

6. Other uses for PVA emulsions in the building supply field were being developed. Articles appeared in various publications in the United States and England suggesting and discussing such uses, and several patents were issued.

1950 for finishing the rest of the hotel was a public use, not experimental.

Elvacet 81–900, when brushed on a wall, dries to a film within 20 to 30 minutes, changing from milky to clear; if wet plaster or other hydraulic cementitious material is applied over it the film will redisperse. Most commercially available PVA emulsions yield films which are water permeable.[7] Indeed, even if HXG is added up to half the weight of the emulsion, Elvacet 81–900 yields a film which is water permeable and redispersible. I find as a fact that the PVA emulsion was the operative factor in the Wardman Park use.

In February, 1951, Larsen purchased a liquid plastic adhesive, a PVA emulsion, from Delcote, Inc., his supplier of library adhesives, labeled it "Plaster-Weld" and sold it in a commercial transaction to Hudson Supply and Equipment Company of Washington, D. C., a supplier to the building trades. One sale from Hudson to a commercial plasterer in March, 1951, was proved in this case. Hudson advertised the product as "Plaster-Weld" and said: "Just brush or spray Plaster-Weld on the surface, then plaster right over it. Its permanent, powerful adhesive strength never crumbles or lets go. It welds fresh plaster to Any surface permanently!" Such an advertisement appeared in a Washington newspaper on July 28, 1951. On the label used in February, 1951, and for some time thereafter Larsen stated that his "Plaster-Weld" product was "thoroughly tested" and "welds plaster" to concrete, brick, wood and other substances.

*Activities of Larsen and Groome—*
*1951–1952*

Around June, 1951, Larsen decided that it would be desirable to manufacture the "Plaster-Weld" product himself, and, if possible, to improve it; so, in July, 1951, he got in touch with Groome, who was still working for the Government Printing Office. Larsen gave Groome a sample of the adhesive which was then being sold under the "Plaster-Weld" label. Groome testified that it was essentially a PVA emulsion, a compounded PVA emulsion of the class of Elvacet, Polyco or Gelva, which were commercially available. By reason of his prior work with plasticizers for the Government Printing Office, the results of which had been published, and of other general knowledge available to persons having ordinary skill in the art, Groome had no difficulty in deciding that the best plasticizers to add to a PVA emulsion were (P)CDP, TCP and HXG,[8] in the proportions shown in Claim 2 of the patent in suit.

Early in 1952 Larsen began selling as "Plaster-Weld" a PVA emulsion compounded substantially in accordance with Claim 3 of the patent in suit.[9] The first commercial sale of this product was May 1, 1952. It was in a gallon can with a light blue label carrying "just the name 'Plaster-Weld' with little instructions how to use it". Shortly thereafter, a pink label was adopted, which has been used ever since and has contained various instructions, e. g. "Brush, roll or spray a good coating of Plaster-Weld on the surface to be covered and let it dry to

7. Some of the claims of the patent in suit refer to the film as being "re-emulsifiable"; others refer to the film as being "water-permeable". Although these two terms ordinarily do not have exactly the same meaning, they, together with the term "redispersible", are used interchangeably by the patentees in their applications and by Groome in his deposition filed in this case. If a film were literally re-emulsified, it is doubtful whether it would hold the plaster on the wall. Water permeable is the more accurate term; the water permeability of

the resulting film is what makes a PVA emulsion a suitable bonding agent. The PVA emulsion publicly used at Wardman Park in 1950, as well as the emulsions described in the patent in suit, share this essential quality.

8. See Note 1, supra.

9. The formula which the plaintiff corporation now uses is a secret, but it is conceded that for some time after April, 1952, "Plaster-Weld" was made substantially in accordance with Claim 3 of the patent in suit.

the touch (1 hour on porous surfaces— 2 hours on non-porous surfaces). Plaster can be applied any time thereafter, either immediately or later." Sometimes the following sentence has been added: "Too much time lag in excess of a week or ten days may require recoating". The initial waiting period was simply to allow the emulsion to dry sufficiently to form a film so that the plaster could be applied to the film and not to a wet, slippery surface. This was in accordance with the general practice in the field of plastering, as any good plasterer would know. Another label read: "Brush or spray a thin coating of Plaster-Weld on the surface to be covered. Plaster can be applied any time thereafter, either immediately or as much as weeks later. If Plaster-Weld is to be used on surfaces with absolutely no suction, such as glass and tile, it is best to let Plaster-Weld set for about an hour before plastering over it."

### The 1952 Application

On April 11, 1952, Larsen and Groome filed an application, Serial No. 281,914, for a composition patent for "Bonding adhesives, particularly for bonding hydraulic cementitious materials." In the original specification the applicants stated, inter alia: " * * * we have discovered the remarkable suitability of aqueous emulsions of the polyvinyl acetate resins, provided, however that such emulsions are compounded with added materials * * *. These polyvinyl acetate resin emulsions are known materials of commerce. * * * and we make no claim to particular polyvinyl acetate emulsions *per se*. * * * such emulsions, alone, will not form a satisfactory adhesive. * * * Therefore, we were obliged to find addition agents which could be incorporated with the polyvinyl acetate resin emulsion and which would so modify its properties that films * * would successfully 'bond' or 'weld' finish coatings of plaster * * *. After investigating many different kinds of materials, in the nature of plasticizing agents, to be added to the basic emulsion of the polyvinyl acetate resin we discovered the remarkable modifying properties of a mixture of the Arachlors, which are polychlorinated diphenyl, tricresyl phosphate, and hexylene glycol. All of these three agents are well-known chemicals procurable in the open market. We learned that the addition of small amounts of the polychlorinated diphenyls markedly increased the flexibility of films deposited from an aqueous emulsion of the polyvinyl acetate resins. But of equal, if not greater significance, is our discovery that these addition agents, the polychlorinated diphenyls, remarkably increased the adhesive characteristics of the deposited films and at the same time so changed the deposited resin film that it retained a degree of water permeability, sufficient to establish a firm bond with aqueous surfacing agents, such as the plaster, applied thereover."

This specification was misleading, whether intentionally or not. The ordinary PVA emulsions (such as Elvacet 81–900) yielded films which were water permeable, and that was the basis for the success of the composition used at Wardman Park in 1949 and 1950 and the composition sold as "Plaster-Weld" by Larsen alone before April 11, 1951 (the critical date). Many claims made by Larsen, his wife and the plaintiff corporation in advertisements published both before and after 1952 said that the product was "thoroughly tested" and had been used successfully at Wardman Park and elsewhere.

The original composition claims in the 1952 application of Larsen and Groome were quite broad and said nothing about the composition being "allowed to dry". The application contained no process claims and did not specify any required drying time. It stated: "In use, the adhesive of the present invention is simply coated upon the base material, and the finishing material to be bonded to the base material applied either immediately or after a drying period. Normally, structural walls, say of concrete or wood, are brushed or sprayed with the adhesive composition, and then the finishing coating or layer, say of plaster is applied at

anytime thereafter convenient to the working schedule."

The claims were rejected as unpatentable over two American patents.[10] Thereupon, on May 13, 1953, applicants amended two of their claims, adding the words "said composition when applied as a coating and allowed to dry yielding a water permeable film". The wording of the two claims thus became the wording which was later allowed as Claims 2 and 3 of the patent in suit.

Herbert J. Larsen died on May 25, 1953, the same day on which he filed an application for a Canadian composition patent. At no time during his life did he ever file any application individually, or with Groome, or with anyone else, claiming a process or a structure.

### The 1954 Application

Late in 1953, the Patent Office indicated that the two amended claims in the 1952 application would be allowed, however, on April 14, 1954, Phyllis H. Larsen, administratrix of the estate of Herbert J. Larsen, filed a new application, Serial No. 423,236, for "Bonding hydraulic cementitious materials", as a continuation in part of the pending application, No. 281,914. The new application contained broad claims for a process and a laminated structure. On August 16, 1954, Groome, Mrs. Larsen, administratrix, and Larsen Products Corporation, the assignee of record, abandoned application No. 281,914.

In her affidavit filed on April 14, 1954, in support of the new application, Mrs. Larsen swore that Larsen was the original, first and sole inventor of the improvement in the process for bonding hydraulic cementitious materials described in the claims in the annexed specification, and that the process was never "known or used before the invention or discovery thereof by the said Herbert J. Larsen, * * *, or in public use or sale in the United States for more than one year prior to this application." On April 27, 1955, Groome made affidavit that he was familiar with the subject matter of the patent application of Herbert J. Larsen, deceased, Serial No. 423,236.

On August 5, 1955, a petition to make special, i. e. to take the 1954 application up for examination out of turn, was filed by the attorney for the administratrix because a competing product, "Dura-Weld", was on the market. This petition was denied by the Commissioner of Patents.[11] Thereupon, on September 19, 1955, the attorney for the applicant administratrix filed a petition alleging: "* * * It appears clear from the attached affidavits that the manufacturers of the 'Dura-Weld' product are guilty of contributory infringement of the process and structure claims in that they are manufacturing a polyvinyl acetate emulsion which reemulsifies in contact with water. * * *"[12] This broad charge of contributory infringement indicates that the applicants were not sincere in their statement that their application was for an "improvement" in the process; what they really wanted was to prevent anyone from using the process which had been developed by Larsen be-

10. Tompkins, Patent No. 2,435,909, and Kunze, Patent No. 2,588,543.

11. The Commissioner stated: "The affidavits filed in support of the petition do not show that there has been an actual infringement of the claims. The affidavits refer to an infringing *product*, identified as an aqueous emulsion of polyvinyl acetate, while all the claims call for a *process*, or *laminated structure*, or a *specific emulsion*. The report of George G. Groome, relied upon to show the composition of the infringing emulsion, does not show that it has the composition required by the claims directed to an emulsion. * * *"

12. The petition was accompanied by an affidavit of Groome, who deposed: "* * * That 'Dura-Weld' is for use in connection with bonding a hydraulic cementitious material to a base layer and is used according to the directions printed on the 'Dura-Weld' label and is brushed or sprayed on the base layer and after it has dried the hydraulic cementitious material is applied; that a dried film of 'Dura-Weld' is water permeable and will redisperse upon application of water."

fore 1949 and had been in public use since 1950.

Later, in May, 1956, Mrs. Larsen and Groome filed an affidavit stating that Larsen and Groome invented a chemical composition for which the 1952 application was filed; that Larsen invented a process for applying a bonding agent, for which the 1954 application was filed naming Larsen as sole inventor; that the 1954 application originally disclosed but did not claim the chemical composition which was the subject matter of the 1952 application; that the two allowed claims in the 1952 application, "directed to the chemical composition comprising an aqueous emulsion of a PVA resin", were subsequently added to the 1954 application, and the 1952 application was abandoned; that the 1954 application "now" discloses and claims an invention of both Larsen and Groome and both parties should appear as inventors in said application; that the failure to list both Larsen and Groome as inventors in the 1954 application was not noticed until March, 1956; and that this failure to include all of the joint inventors was made through error and without deceptive intent. Another affidavit of Mrs. Larsen and Groome filed the same day stated that Larsen and Groome were the original, first and joint inventors of the "improvement" in the process for bonding hydraulic cementitious materials described in the 1954 application.

■ On May 25, 1956, the Examiner denied the request to make the 1954 application joint, because the statement of facts did not support such conversion. The Examiner said: "The original specification [in the 1954 application] also included a claim to the [laminated] article. There is no declaration in the statement of facts that George G. Groome was a joint inventor of the process or article claims. The joint inventors must be joint inventors of all the claims in the case. A claim to an invention which had been made by a single inventor contained in a patent issued to that inventor and another jointly for matter which had been jointly invented by them will be declared invalid, Welsbach Light [Co.] v. Cosmopolitan Light, 104 Fed. 83. (CCA 7, 1900)."

The process and article claims referred to by the Examiner would have covered the process used at Wardman Park in 1950 and the laminated structure created thereby. The Examiner was not told of that use, which antedated Larsen's first meeting with Groome.

■ However, in July, 1956, Mrs. Larsen and Groome filed another affidavit in which they made oath: (a) that Herbert J. Larsen evolved the original concept of utilizing a PVA emulsion in connection with bonding plaster and the like to a base surface; (b) that Larsen and Groome developed an improved specific PVA emulsion which was the subject matter of the 1952 application for "Bonding Adhesives"; (c) that Larsen and Groome discovered the re-emulsifiable characteristics of the specific PVA emulsion which was their joint invention;[13] (d) that Larsen and Groome developed a process for utilizing the specific PVA emulsion and "the re-emulsifiable characteristics of this emulsion wherein the bonding agent comprising the PVA emulsion is permitted to dry on the base surface and the hydraulic cementitious material is applied thereafter, re-emulsifying the bonding agent"; (e) that the process, bonding agent and laminated structure disclosed and claimed in the 1954 application was in fact the joint invention of Larsen and Groome; (f) that the failure to list both Larsen and Groome as inventors in the 1954 application was not noticed until March, 1956, and that this failure was made through

13. Perhaps Groome did discover in 1952 the scientific explanation of what made Larsen's process work. However, the discovery of the scientific explanation for a previously known and publicly used process is not patentable. · Novocol Chemical Mfg. Co., Inc. v. Powers & Anderson Dental Co., Inc., 4 Cir., 128 F.2d 904, 907; Allen et al. v. Coe, 77 U.S.App.D.C. 324, 135 F.2d 11; Davison Chemical Corp. v. Joliet Chemicals, Inc., 7 Cir., 179 F.2d 793.

error and without deceptive intent. On August 3, 1956, the Examiner granted the request to convert the sole application to a joint application.

Applicants thereupon proposed to amend the application under Rule 312 by adding: "It is to be understood that the term 'polyvinyl acetate emulsion' is intended to cover emulsions which are commercially listed as polyvinyl acetate emulsions and which have the general characteristics of the material herein defined". This request was denied because, as the Commissioner stated: " * * * it appears to attempt to broaden the original disclosure beyond its original scope at the time of filing and to introduce a broader interpretation of the claims".

On August 28, 1956, the patent in suit was issued, granting the claims set out under the heading "Patent in Suit", supra.

### Defendants' Product

Defendants' product, "Link", is a PVA emulsion containing CDP and HXG.[14] It also contains alkyl-aryl phosphate, which is an equivalent of TCP. The "Link" product is similar to the compositions in Claims 2 and 3 of the patent in suit, except that the amount of HXG in Link is 3.15 parts by weight of the PVA emulsion, whereas the teaching and claims of the patent in suit require that the amount of the HXG should be about 2 parts by weight. Defendants used CDP, an alkyl-aryl phosphate and HXG because those plasticizers were suggested to them by salesmen for the chemical companies which were selling those plasticizers to various concerns for similar purposes. This advice from the salesmen was supported by information in the DuPont and Monsanto catalogs and in the general literature referred to above, which was available to defendants as well as to anyone else interested in the field.

"Link" was first sold on or about April 10, 1953. At the time "Link" was put on the market, other companies had begun or were considering the manufacture and sale of a similar product. It was common knowledge that "Plaster-Weld" was a PVA emulsion plasticized with appropriate plasticizers, and had been essentially such ever since it was put on the market in February, 1951.[15] The labels and the literature used by defendants in connection with the sale of "Link" state that plaster may be applied up to several days after the film has turned from milky to clear.

### Plaintiffs' Advertisements and Threats

An advertisement of plaintiff Larsen Products Company, published in February, 1953, when Plaster-Weld was being made in accordance with the requirements of Claims 2 and 3 of the patent in suit, stated: "You apply Plaster-Weld with brush, roller, or spraygun, covering 500 to 800 sq. ft. per gallon. Then—in 40 minutes or whenever after you like— you put on your plaster." Another advertisement said: "Plaster-Weld can be covered at once or days after its application. Dries in 40 Minutes or Less * * *." These directions and advertisements must be contrasted with plaintiffs' present contention that letting the film dry is a part of the process.

Plaintiffs have issued bulletins and advertisements in which they have threatened infringement suits against anyone who applies a bonding agent "capable of bonding plaster after it has dried" and who "allows it to dry to a film state before plastering—*either in accordance with or contrary to the manufacturer's directions * * *.*" Once again it is apparent that plaintiffs are really trying to prevent anyone from using Larsen's process in the way it was used at Wardman Park and elsewhere in 1950 and 1951, although plaintiffs' efforts to have their claims so broadened had been denied.

14. See Note 1, supra.

15. The advertisements of "Plaster-Weld" referred to earlier uses, notably at Wardman Park.

## Discussion

### Claim 1.

Herbert J. Larsen, individually, before 1949 conceived the idea of using a PVA emulsion as an adhesive to bind plaster to a smooth wall or ceiling surface. The idea proved successful in operation, because the PVA emulsion quickly dried to a film which was water permeable, creating an interlock when the wet plaster was applied. The PVA emulsion which Larsen used was the kind then being sold as a library adhesive. It does not appear what if any plasticizers were included in the products with which Larsen originally experimented, which were used experimentally at Quebec House and at Wardman Park in 1949, which were used publicly at Wardman Park in 1950, and which were sold by Larsen to Hudson and were used generally in Washington from and after February 1, 1951. If any plasticizers were used, and it is probable that they were, they did not create the water permeability of the film, but were of such character and were used in such amounts that they did not destroy the water permeability which the PVA emulsion itself imparted to the film. See Note 7, supra.

If Larsen had filed a timely application for a patent embracing such use of a PVA emulsion, there would have been strong arguments in favor of the allowance of broad structure and process claims, and strong equities in favor of his position. But Larsen never made an application for a structure or a process claim, either alone or jointly with anyone. Such an application was first made by Mrs. Larsen as his administratrix in April, 1954.

■ The structure which was produced at Wardman Park in 1950 and the structures which were produced by the use of the "Plaster-Weld" sold by Larsen to Hudson and used generally and publicly in Washington from and after February 1, 1951, were laminated structures essentially similar to the structure described in Claim 1 of the patent in suit. Claim 1 is therefore invalid, because the invention claimed therein was in public use or on sale in this country more than one year prior to the application for the patent, whether the date of the application be treated as April, 1954, or as April, 1952. 35 U.S.C.A. 102(b).[16]

### Claims 2 and 3.

Sometime between July, 1951, and April, 1952, Larsen and Groome developed the composition claimed in the 1952 application and in Claims 2 and 3 of the patent in suit. These compositions were preferable to the compositions theretofore manufactured, sold, and used by Larsen and others in the practical application of the process Larsen had developed; they yielded a film which was more flexible and durable than the film produced by the original PVA emulsion used and sold by Larsen, and resisted fire and weather better. This result was obtained by adding certain plasticizers to the PVA emulsion.

The plasticizers which Larsen and Groome included, and the amounts of each plasticizer specified in the composition claims were clearly indicated by the prior art, including Groome's own findings published in 1946 by the Government Printing Office as Bulletin B–4 and various bulletins and catalogs issued by chemical companies which manufactured PVA emulsions and plasticizers, particularly the DuPont and Monsanto bulletins issued during the 1940's. The choice of the specified plasticizers, or other plasticizers equivalent thereto, would have been obvious in 1951 and 1952 to a person having ordinary knowledge and skill in the adhesive art. Indeed, they were chosen by defendants before the patent in suit was issued. Moreover, Kunze and Evans, Patent No.

16. Moreover, Claim 1 is probably barred because Larsen and Groome, the *joint* patentees of the patent in suit, were not the inventors of the structure claimed, which was first produced by Larsen some time before he first met Groome. See secs. 102(f) and 116; In re Hamilton, 38 F.2d 889, 17 CCPA 914; Stewart v. Tenk, C.C.S.D.Ill., 32 F. 665.

2,588,543, issued March 11, 1952, on an application filed April 6, 1950, contained a long discussion and disclosure of the same or equivalent plasticizers, including their effect in making various PVA emulsions more water resistant, thereby teaching in general terms the amount of the various plasticizers which could safely be used to obtain an opposite result.

The application filed by Larsen and Groome on April 11, 1952, contained broad composition claims, which were not allowed. Two narrow, preferred composition claims were finally allowed when the following words were added by amendment: "said composition, when applied as a coating and allowed to dry, yielding a water permeable film".

Plaintiffs make much of this added wording. However, the added words merely describe what takes place in the use of ordinary PVA emulsions and compounds, as well as in the use of the preferred compositions, unless that property or characteristic has been destroyed by some additive. Larsen and Groome did not discover in 1951 or 1952 or at any other time that allowing the film to dry was necessary to create a water permeable film. The PVA emulsion which was used publicly at Wardman Park in 1950 and the PVA emulsion sold by Larsen as "Plaster-Weld" in February, 1951, was necessarily allowed to dry to the point that it ceased to be an emulsion and became a film, firm enough to permit plaster to be applied thereon. Although the testimony is not clear, it appears that there may be an intermediate tacky phase, but such a phase, if any, is very brief in the case of a PVA emulsion as compared with a latex elastomer. At Wardman Park and in the other public uses of Larsen's PVA emulsion there was no reliance on tackiness to bond the plaster; the fact that the film which was formed when the emulsion had been allowed to dry for 15 or 20 minutes was water permeable was what made the process work, i. e. what made the PVA emulsion a suitable bonding agent.

The advertisements of "Plaster-Weld" over the years have stressed the fact that the product and the process are essentially the same as those used successfully at Wardman Park and continuously thereafter. Nevertheless, plaintiffs contend that this allegedly new element is an essential part of the invention claimed in the patent in suit and differentiates the compositions claimed in Claims 2 and 3 and the process claimed in Claims 4 to 8 from the composition and process used at Wardman Park and by the purchasers of "Plaster-Weld" in the early part of 1951.

The phrases "allowed to dry", "drying the film" and "permitting the film to dry", all of which are used in the claims of the patent in suit, are ambiguous phrases since they do not indicate to what extent the film must be free of moisture. If they mean that after the emulsion is applied to the base the emulsion must be allowed to dry to the point that it ceases to be an emulsion and becomes a film, they teach no more than was already known as a result of the public use of the PVA emulsion at Wardman Park in 1950 and generally in Washington before April 11, 1951 (the critical date), namely, that drying usually occurs in 15 to 30 minutes and the plaster may be applied immediately thereafter. If the phrases mean that the film must be allowed to dry to any greater extent, they are misleading, because it is not necessary to allow the film to dry out.

The duration of the period after the emulsion has dried sufficiently to form a film during which the plaster may be applied depends upon many factors, including the plasticizers used, if any, the amount of heat, etc. The fact that the plaster may be applied a day or two later, or even longer, is an important element of the process and product, and the plasticizers specified in the claims of the patent in suit undoubtedly lengthen the period. But it was a matter of common knowledge to competent persons in the field in 1951 that those particular plasticizers, used in substantially the specified proportions, would have that effect.

Plaintiffs' advertisements during and shortly after 1952, while "Plaster-Weld" was admittedly being made in accordance with the composition claims of the patent in suit, as well as the directions given on the cans, indicated that the plaster could be applied as soon as the "Plaster-Weld" was dry to the touch, or that it could be applied "anytime thereafter, say immediately or later", or, in the words of another advertisement, "whenever you like".[17] It is not necessary to allow the compositions referred to in the claims of the patent in suit to dry to any greater extent than it was necessary to dry the PVA emulsion used at Wardman Park and generally in Washington before April, 1951.

Since, therefore, the essential facts of the compositions claimed in Claims 2 and 3 had been known and essentially similar compositions had been used publicly for more than a year before April 11, 1952, and since the claimed improvements, consisting of the addition of certain plasticizers in specified amounts, would have been obvious in 1950 and 1951 to a person having ordinary knowledge and skill in the adhesive art, Claims 2 and 3 are invalid. Secs. 102(b) and 103. Maibohm v. R.C.A. Victor Co., 4 Cir., 89 F.2d 317; Novocol Chemical Mfg. Co. v. Powers & Anderson Dental Co., 4 Cir., 128 F.2d 904.

### Claims 4 to 8

A. A fortiori, the same reasons which render invalid Claims 2 and 3 render invalid the process Claims 4 to 8.

B. These claims are also barred by the public use from May 1, 1952, to April 14, 1953, of "Plaster-Weld" made in accordance with the teaching of Claims 2 and 3, and used in accordance with the process claimed in Claims 4 to 8. Plaintiffs vainly seek to avoid this result by asserting that the 1954 application is a continuation in part of the 1952 application, and that under sec. 120 the effective date of all the claims in the patent in suit is April 11, 1952.

The facts on this point are set out above under the headings "The 1952 Application" and "The 1954 Application".

Section 120 provides that a patentee may have the benefit of an earlier filing date if, inter alia, the earlier application contains the disclosure required by the first paragraph of sec. 112, which provides: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most clearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention." See also Rule 118 of the Rules of Practice of the U.S. Patent Office, 37 C.F.R. 1.118, 35 U.S.C.A. App. 1. Thus the question is whether the process claimed in Claims 4 to 8 of the patent in suit is disclosed by the April 11, 1952 application in the manner required by sec. 112.

A common feature of Claims 4 to 8 is "drying the film" (in one instance "permitting the film to dry"). Plaintiffs' counsel has argued that this is an essential element of the process.

The 1952 application said nothing about the need for drying the film or permitting the film to dry. It referred to the fact that the composition "would dry out to yield films which were water permeable", but went on to say: "In use, the adhesive of the present invention is simply coated upon the base material, and the finishing material to be bonded to the base material applied either immediately or after a drying period. Normally, structural walls, say of concrete or wood, are brushed or sprayed with the adhesive composition, and then the finishing coating or layer, say of plaster is applied at anytime thereafter convenient to the working schedule."

17. The advertisements are set out above under the heading "Plaintiffs' Advertisements and Threats", the directions under the heading "Activities of Larsen and Groome—1951–1952".

If "drying the film" is an essential part of the process, as plaintiffs now contend, that element was not disclosed by the 1952 application.

Moreover, in the patent in suit, it is stated: "While the invention embraces broadly the use of such polyvinyl acetate emulsions and, as such, is entirely operative, it has been found that the addition of plasticizers and the like is beneficial." And later: "The bonding agent may consist simply of the commercially available polyvinyl acetate emulsions. Advantageously, however, plasticizers such as those referred to above are also present."

On the other hand, the 1952 application stated that the invention involved "so modifying the basic polyvinyl resin emulsion that films thereof, when deposited on a base material, would dry out to yield films which were water permeable". This modification was said to be accomplished by adding certain plasticizers since "* * * such emulsions, alone, will not form a satisfactory adhesive". As we have seen, this statement is inaccurate, because the PVA emulsion itself yields a film which is water permeable and which proved a firm adhesive and bonding agent at Wardman Park and elsewhere. The purpose of adding the plasticizers was to increase its flexibility, and to give other qualities to the product, not to make it water permeable, redispersible or re-emulsifiable. See Note 7.

For the purposes we are now considering, however, the important point is not that the 1952 application was inaccurate, but that in this respect the 1952 application is so different from the 1954 statement and Claims that it did not disclose in "full, clear, concise and exact terms" the invention claimed by Claims 4 to 8 of the patent in suit.

For each of these reasons, therefore, the effective filing date of the process claims of the patent in suit is April 14, 1954, and the claims are barred by the public use of the process more than one year prior to that date. In re Steenbeck, 83 F.2d 912, 23 CCPA 1244; Application of Ruscetta and Jenny, 255 F.2d 687, 45 CCPA 968; Benz v. Celesta Fur Dyeing & Dressing Corp., 2 Cir., 136 F.2d 845; D.C.S.D.N.Y., 57 F.Supp. 895; 2 Cir., 156 F.2d 510, certiorari denied 329 U.S. 736, 67 S.Ct. 101, 91 L.Ed. 635; R.U.V. Engineering Corp. v. Borden Co., D.C. S.D.N.Y., 67 F.Supp. 587; 2 Cir., 170 F. 2d 688. As the Supreme Court said in Muncie Gear Works, Inc. v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171, a case similar in many respects to the case at bar: "To sustain the claims in question upon the established and admitted facts would require a plain disregard of the public interest sought to be safeguarded by the patent statutes, and so frequently present but so seldom adequately represented in patent litigation." 315 U.S. at page 768, 62 S.Ct. at page 870.

### Presumption of Validity

In holding the patent invalid, the court has not been unmindful of the rule that a patent is presumed to be valid, 35 U.S.C.A. § 282, that this is a strong presumption, and that one seeking to invalidate the patent has the burden of producing evidence which is convincing beyond a reasonable doubt. The Barbed Wire Patent (Washburn & Moen Manuf'g Co. v. Beat 'Em All Barbed-Wire Co.), 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 60, 43 S.Ct. 322, 67 L.Ed. 523; Radio Corporation of America v. Radio Engineering Laboratories, 293 U.S. 1, 8, 55 S. Ct. 928, 79 L.Ed. 163; Inglett & Corley, Inc. v. Baugh & Sons Co., 4 Cir., 261 F.2d 402, 405. The same burden normally applies where the asserted ground of invalidity is a prior public use. The Barbed Wire Patent, supra; Inglett & Corley, Inc. v. Baugh & Sons Co., supra. But the presumption is at least weakened where, as here, the Patent Office was not informed of the patentee's prior use. See Maibohm v. R.C.A. Victor Co., 4 Cir., 89 F.2d 317; Lempco Products v. Timken-Detroit Axle Co., 6 Cir., 110 F.2d 307, 310; Western Auto Supply Co. v. American-National Co., 6 Cir., 114 F.2d

711, 713; Cutler Mail Chute Co. v. Capital Mail Chute Corp., 2 Cir., 118 F.2d 63, 64; Copease Mfg. Co. v. American Photocopy Equipment Co., D.C.N.D.Ill., 189 F. Supp. 535. However stringent the burden may be, it has been satisfied in this case.

### Infringement and Misuse

This decision makes it unnecessary to pass on the question of infringement of the several claims and on the defense of alleged misuse of the patent.

### Conclusion

All claims of the patent are invalid. I will enter an appropriate order.

### Supplemental Opinion

Defendants filed a counterclaim herein under the Declaratory Judgments Act, 28 U.S.C.A. § 2201, asking that the patent in suit be declared invalid and void, not infringed, unenforceable, and for an injunction restraining the plaintiffs from interfering with the business of defendants and defendants' customers, and for defendants' costs and reasonable attorneys' fees, and for such other and further relief as to the court may seem just and circumstances warrant.

I have found that all claims of the patent are invalid and, therefore, unenforceable, but have refrained from passing on the question of infringement. Defendants are entitled to an injunction restraining plaintiffs, their officers, directors, associates, agents, including advertising agents, attorneys, workmen, and employees, and those in active concert and participation with them, or in privity with them, from directly or indirectly asserting said patent in any way against defendants or defendants' customers with respect to the manufacture and sale and use of defendants' product "Link".

Under all the circumstances of the case, I do not feel that defendants are entitled to recover their attorneys' fees or other expenses, except costs, which in this case should include all the reporter's charges, as well as the costs of the depositions.