**INDIANA GENERAL CORPORATION,**
Plaintiff,

v.

**LOCKHEED AIRCRAFT CORPORATION, Defendant.**

Civ. No. 63–412.

United States District Court
S. D. California,
Central Division.

Jan. 12, 1966.

Harris, Kiech, Russell & Kern, Donald C. Russell and Walton Eugene Tinsley, Los Angeles, Cal., for Indiana Gen. Corp.

Mellin, Hanscom & Hursh, Oscar A. Mellin, San Francisco, Cal., and Rodgers Donaldson, Burbank, Cal., for Lockheed Aircraft Corp.

HALL, District Judge.

This is a patent case wherein the plaintiff seeks an injunction and damages for infringement. The defendant's answer denies infringement and alleges invalidity on the customary array of grounds, only one of which is involved at this time.

The matter for immediate consideration and decision is the defendant's motion for summary judgment [F.R.Civ.P. 56(b), (c), (e)].

Before discussing the specific questions raised in the motion, it is necessary to make some general observations concerning the use of summary judgment and to advert to the contention of the plaintiff that summary judgment is not "ordinarily appropriate" in a patent case. A number of cases are cited to that effect, but, regardless of their holdings, it must be said that summary judgment

is not either "ordinarily" or otherwise appropriate in *any* case, if there is a genuine issue as to a material fact and, if so, that the movant is not entitled to a judgment as a matter of law.

The imprimatur of Rule 1 is that the rules should be construed "to secure the just, speedy, and inexpensive determination of every action." The Federal Rules of Civil Procedure are to be construed broadly and liberally to that end. Phillips v. Baker (9 Cir., 1941), 121 F.2d 752, 754; Fong Sik Leung v. Dulles (9 Cir., 1955), 226 F.2d 74, at 80. Rule 56 was put in the rules to be *used*, and there is no reason why this salutary doctrine should not apply to Rule 56. Indeed there would now appear to be greater need for an increasing use of summary judgment procedure by defendants since the Supreme Court in Conley v. Gibson [1] and the Ninth Circuit in Corsican Productions v. Pitchess [2] have for all practical purposes nullified F.R. C.P. 12(b), (6), which permits motions to dismiss for "failure of the pleading to state a claim upon which relief can be granted." Thus defendants in federal courts are forced either to go to the very great expense of a trial on the merits of any and every unsubstantial and coercive claim howsoever unfounded in fact or law which may be made by an imaginative plaintiff in pro. per.[3] or by his counsel, or have resort to the summary judgment procedure, which is the only other means provided by the rules to secure the *speedy* and *inexpensive* determination of claims for relief.

There is no logical reason why summary judgment should not be granted in patent cases as distinguished from other cases. True, it is sometimes more difficult to isolate the material facts in a patent case than in others, in order to determine if a genuine issue exists as to them; but, if such facts can be isolated and stated with reasonable clarity, the movant is entitled to have the court do so and to determine whether or not there *is* a *genuine* issue as to them, and, if not, whether or not such party is entitled to a judgment as a matter of law on such facts. If there is a genuine issue as to such material facts, then a summary judgment should not be granted by the plain terms of the rule, and it is needless to recite the numerous cases to that effect.

The Ninth Circuit, without discussing the propriety of the use of summary judgment procedures, upheld the validity of a patent, but indicated lack of infringement could have been disposed of summarily on examination of the file wrapper, at p. 545 in Moon v. Cabot Shops (9 Cir., 1959), 270 F.2d 539, cert. den. 361 U.S. 965, 80 S.Ct. 596, 4 L.Ed.2d 546. It affirmed summary judgments in Engelhard Industries v. Research Instrumental Corp., 9 Cir., 324 F.2d 347, cert. den. 377 U.S. 923, 84 S.Ct. 1220, 12 L.Ed.2d 215 (rep. below D.C., 196 F.Supp. 138); and Oregon Saw Chain Corp. v. McCulloch Motors Corp. (9 Cir., 1963), 323 F.2d 758. See also McCulloch Motors Corp. v. Oregon Saw Chain Corp. (D.C. 1964), 234 F.Supp. 256, in which this court held three patents invalid on mo-

---

1. In Conley v. Gibson (1957), 355 U.S. 41, at 45, 78 S.Ct. 99, at 102, 2 L.Ed. 2d 80, the Court said: " * * * that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

2. In Corsican Productions v. Pitchess (9 Cir., 1964), 338 F.2d 441, at 442, the Court went even further and said that the rule of Conley v. Gibson " 'precludes dismissal for insufficiency of the complaint except in the extraordinary case where the pleader makes allegations which show on

the face of the complaint some insuperable bar to relief.' Wright, Federal Courts 250 (1963)."

3. No suggestion is implied that either plaintiffs or their counsel fall into that category. But there has been an alarming increase in the number and prolixity of pro. per. suits which would have been dismissed because they failed to state a cause of action, but which now require defendants to go to the expense of disproving preposterous allegations by trial or have recourse to summary judgment procedure.

tions for summary judgment, the appeals from which were dismissed. In Barkeij v. Lockheed Aircraft Corp. (9 Cir., 1954), 210 F.2d 1, at page 2, the Ninth Circuit said: " * * * it is the duty of the court to dismiss a patent infringement suit whenever it affirmatively appears that the patent is invalid." (Citing cases.) If it affirmatively appears on a motion for summary judgment that the patent is invalid, the duty to dismiss is as compelling as it would be after hearing evidence. While the *Barkeij* case was dismissed at the conclusion of plaintiff's case on trial, nevertheless, as pointed out in Allen v. Radio Corporation of America (D.C.Del.1942), 47 F.Supp. 244, there is no reason why a patent case should not be decided on a summary judgment when it appears that there is no genuine issue as to any material fact.

In light of the foregoing general principles I will proceed to an examination and determination of the matters involved on this motion.

Broadly stated, the ground for the motion is that under F.R.C.P. 56 there is no genuine issue as to the following material facts, viz.: the invention and its use was described in printed publications in this country, and the invention was in public use, on sale, and sold in this country, all more than one year prior to the earliest date to which plaintiff is entitled as the date of the application for the patent in suit, which would void the patent as being in contravention of 35 U.S.C. 102 (b).[4]

Those facts are material facts on the question of validity, and if there is no genuine issue as to them, it can be said, without further discussion, that the defendant would be entitled to a judgment of invalidity of the claims involved as a matter of law.

In order to reach the question required to be resolved on this motion it is necessary to have a general understanding of the patent and the products involved. It is patent No. 2,981,689 for "Square Loop Ferrites" and was granted April 25, 1961. The *"new and useful"* thing which the plaintiff claims to be disclosed by the patent is that "hysteresis loops of substantially square, or rectangular shape" is a property of the ferromagnetic ceramic bodies which are produced under it.

The product involved is used in various electronic devices, but probably its greatest use is as a magnetic memory core for electric computers. It may take many forms and shapes. It can be about the circumference and thickness of the period which is set off immediately following this line in the middle of the page,

with a hole in it.

The product in that form may be strung on wires which permits many thousands to be used in a small space in a computing machine.

The specifications in the patent in suit give seven examples in technical language[5] of different formulas for making the product, each of which shows the "mol percent"[6] of each component and

---

4. Section 102(b), Title 35:
   "A person shall be entitled to a patent unless—
   "(b) [T]he invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

5. The matter was submitted with limited oral argument. Upon examination of the file, an attempt was made to have an understanding of the patent. But not being able to find many of the terms used in even an encyclopedic dictionary, the court required counsel to prepare

a glossary of terms and stipulate to the meaning thereof. Even this took several months, and is not complete as the court has been compelled to resort to the International Dictionary of Physics and Electronics (Van Nostrand), the Condensed Chemical Dictionary, Sixth Edition (Reinhold Publishing Corp.), and other scientific and encyclopedic works for definitions and explanations of terms.

6. A "mol" is the quantity of a substance whose weight in grams is equal to its molecular weight. A "mol percent" is the percentage represented by the number of mols of an ingredient in a mixture or compound as compared to the total

certain properties of the finished product. The knowledge that certain materials produced a hysteresis loop when magnetized, is not new, but a *hysteresis loop which becomes square or rectangular* when magnetized and the uses and advantages of such squareness is new, and is the heart of plaintiff's invention.

The difference in a general way between a typical hysteresis loop and a square one is not difficult of understanding.

Fig. 1 [7] of the patent in suit is illustrative of both. In Fig. 1, a typical hysteresis loop is shown by the dotted lines, and is of a general elliptic shape, and a square hysteresis loop is shown by the solid lines, and is square or rectangular in shape. In Fig. 1 a magnetizing force, in terms of oersteds,[8] is applied in a positive direction, i. e., from left to right in Fig. 1. It begins at a designated point in the lower lefthand corner of Fig. 1 and in the ordinary elliptical hysteresis loop the magnetic flux follows the dotted lines, increasing in "gausses"[9] in a positive (up) direction on Fig. 1 until it levels off at about 2000 gausses as shown in the upper righthand corner of Fig. 1. If the magnetizing force is removed, the magnetic flux drops but does not drop back to zero. Instead, it stops at a point called remanence[10] (sometimes called retentivity), which point is marked as 1000 gausses in the ordinary elliptical loop on the upper (positive) part of the solid vertical line in Fig. 1. If the material is capable of producing a square loop, the magnetic flux, instead of dropping to the point marked 1000 gausses on Fig. 1, does not drop that far but "squares" off in a rectangular shape and

retains a remanence of about 2000 gausses as marked on the upper part of the solid vertical line on Fig. 1.

The technical advantage of a material capable of producing a square hysteresis loop lies principally in the fact that when the appropriate reverse impulse is applied the sharp cornered "square" or "rectangular" loop responds almost instantaneously with an effect similar to the sudden snapping of a mechanical switch.

The practical and commercial advantage of a product which will produce a square hysteresis loop lies not only in the fact that it replaced the bulky vacuum tubes previously used in calculating machines, but also shortened the response time of magnetic memory systems by a ratio claimed to be about 40 to 1, permitting responses to be returned from memory cores in micro-seconds or fractions thereof, thus not only reducing the great bulk of the early electronic machines manyfold, but incredibly increasing the speed of use.

The chronological history of the patent in suit is necessary to an understanding of the ultimate question to be resolved.

The patent is the end result of *four* different applications for patent: The application (No. 442,535, hereafter called the *fourth* application) for the patent in suit was filed *July 12, 1954*, reciting that it was a continuation in part of previous application No. 270351 filed *February 7, 1952* (the *third* application) which in turn was stated to be a continuation in part of application No. 253779 (the *second* application) filed *October 30, 1951*, which in turn was also stated to be a

---

number of mols present in the mixture or compound.

7. A copy of the first sheet of the patent is appended as Exhibit A. It shows Fig. 1.

8. Oersted is the unit of magetizing force used in the CGS electromagnetic system. C stands for centimeter to measure distance, G stands for gram to measure weight. and S stands for seconds to measure time.

9. A gauss is a unit of flux density used in the CGS electromagnetic system.

10. The International Dictionary of Physics and Electronics (Nostrand, 1961) defines remanence as the magnetic flux density which remains in a magnetic circuit after the removal of an applied magnetomotive force.

continuation in part of application No. 67752 (the *first* application) filed *October 28, 1948*. The diagram which follows gives a quick visual understanding of the chronology of the four applications and points up the fact that the patent in suit relies on disclosures in the first application, No. 67752.

CHRONOLOGICAL CHART OF THE FOUR

APPLICATIONS CONCERNED WITH THE PATENT IN SUIT

\* First mention in any of the applications of *square hysteresis loop resulting* from a product; and first mention of its *use* for magnetic computer and memory systems.

\*\* Mar. 7, 1952, Claim 3 amended to include MnO in #67752.

\*\*\* Nov. 17, 1952, final *rejection* of all claims in #67752

The defendant concedes that the combination for making a material with properties which would produce a square hysteresis loop and the use thereof for computers and memory machines was disclosed in plaintiff's second application, No. 253779, filed on October 30, 1951, thereby, of course, conceding that plaintiff would be entitled to October 30, 1951 as the effective date of his invention unless the claims sued on are void for the reasons urged in support of defendant's motion for summary judgment.

But the defendant vigorously contends that such disclosure on October 30, 1951 in the second application is the first disclosure in the Patent Office of the properties of any material which would produce a square hysteresis loop and that the plaintiff did not in any manner or means disclose square hysteresis loop properties or qualities of any material or the use thereof in memory or computer machines or otherwise in the first application on October 28, 1948 as required by 35 U.S.C. 112; [11] and, as heretofore pointed out, that public disclosure of the product and its use to produce square hysteresis loops was disclosed by printed publication, was on sale and sold more than one year prior to October 30, 1951, thus voiding claims 1 and 2 of the patent under 35 U.S.C. 102(b).[12]

Thus the critical application is the first one, No. 67752, and the critical date is its filing date, October 28, 1948.

The following facts are material under the contentions of the parties, and there is no genuine issue as to them: (1) The contents of any of the file wrappers of the four applications, certified copies of which are on file in support of the motion for summary judgment; (2) the filing dates of the various applications; (3) that the plaintiff or its predecessor caused an article authored by the inventor and a responsible official of plaintiff's predecessor to be published in a magazine called "Electrical Manufacturing" in December 1949, which was more than one year prior to the second application, No. 253779, on October 30, 1951; (4) said publication disclosed a ferromagnetic body known as "A–34," "34," "34–A" and "Ferramic–34," and "ferramic A," being different names for the identical product, and that such product had a "square" or "rectangular" hysteresis loop; (5) that a copy of said article disclosing square hysteresis loops came to the attention of W. N. Papian of the Electrical Engineering Department of the M.I.T. who was working on a master's thesis concerning a coincident-current magnetic memory machine; (6) that at his request samples of Ferramic A–34 were sent to him; (7) that thereafter he authored a thesis and on about October 9, 1950, more than one year prior to the second application, No. 253779, filed that thesis in the Library of the M.I.T.; (8) that in said thesis Papian disclosed familiarity and experimentation with plaintiff's product, Ferramic–34, its retentivity and response time; and pointed out that a small ferromagnetic core with "rectangular" (or square) loop characteristics could be made for use in a coincident-current binary memory system; (9) that on or about May 10, 1949, more than two years prior to filing the second application, No. 253779, on October 30, 1951, plaintiff's predecessor commercially sold its product, Ferramic–34, to Phillips Laboratories and shipped the same to, for the use by, said Phillips Laboratories; (10) that ferromagnetic materials capable of square loop hysteresis are highly useful;

11. Section 112, Title 35:
"The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any persons skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

12. See footnote 4 for text of 35 U.S.C. 102(b).

(11) that the second application, No. 253779, and each succeeding one states it is a continuation in part of the first application, No. 67752; (12) application No. 253779 did disclose the square or rectangular hysteresis loop characteristics and properties of the ferrites described therein, and their application and use in computer or magnetic memory machines.

■ There can be no doubt but that the article in the magazine "Electrical Manufacturing," in December 1949 disclosed square hysteresis loops and was a printed publication in this Country, within the plain terms of 35 U.S.C. 102 (b).

Hamilton Laboratories v. Massengill (6 Cir., 1940), 111 F.2d 584, cert. den. 311 U.S. 688, 61 S.Ct. 65, 85 L.Ed. 444, is squarely in point for the proposition that Papian's thesis also, even though typewritten and lodged in the Library of a college, is a printed publication within the meaning of 35 U.S.C. 102(b).

We do not have involved here, as in the line of cases illustrated by Cee-Bee Chemical Co. v. Delco Chemicals, Inc. (9 Cir., 1958), 263 F.2d 150, the question of what the prior art was and what the patent did to improve it. Nor do we have the question of whether or not there was invention, as was involved in Hycon Mfg. Co. v. H. Koch & Sons (9 Cir., 1955), 219 F.2d 353, cert. den. 349 U.S. 953, 75 S.Ct. 881, 99 L.Ed. 1278 or Hall v. Wright (9 Cir., 1957), 240 F.2d 787, or Pointer v. Six Wheel Corp. (9 Cir., 1949), 177 F.2d 153, for the reason that defendant concedes that making and disclosing a ferrite product which produces a square loop hysteresis would constitute invention for the purposes of this motion. What we do have here is the question of determining from the undisputed text of the original application, No. 67752, its file wrapper, the file wrappers of the other applications involved, and the other facts hereinbefore mentioned, whether or not the language of that application No.

67752 discloses a "description of the invention, and of the manner and process of making *and using* it, in such *full, clear, concise,* and exact terms as to enable any persons skilled in the art to which it pertains, or with which it is most nearly connected, to make *and use* the same" (35 U.S.C. 112).

■ That this is a question of law is settled by the Ninth Circuit cases hereinbefore referred to and by Bergman v. Aluminum Lock Shingle Corp. (9 Cir., 1958), 251 F.2d 801. In Minnesota Mining and Mfg. Co. v. Carborundum Co. (3 Cir., 1946), 155 F.2d 746, at 749, the court said:

" * * * the words of a patent or a patent application, like the words of specific claims therein, always raise a question of law for the court and may not be determined by the opinion of experts. Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147; Solomon v. Renstrom, 8 Cir., 150 F.2d 805, 807. The fundamental question in the cases at bar is whether Oakes' 1931 application fulfilled the requirements of R.S. Section 4888, 35 U.S.C.A. § 33; viz., whether Oakes in his 1931 application described his invention or discovery 'in such full, clear, concise and exact' terms as to enable one skilled in the art to ascertain its nature. This is a question of law, open to this court, precisely as it was open to the court below."

In Watson v. Bersworth (1958), 102 U.S.App.D.C. 187, 251 F.2d 898, the court said with relation to the matter pending before it (at 900): "The question is whether the appellees are entitled to claim the invention. The answer turns on the relation between the words of the 1946 application and the words of the 1951 claims," and cited with approval the last above-mentioned case of Minnesota Mining & Mfg. Co.

The defendant has conceded that Ferramic–34 was disclosed in application No.

67752, and that it does have square hysteresis loop properties, but contends that neither the properties of the product described in No. 67752 which would produce a square hysteresis loop nor the applications and uses to which such square loop could be put was made or even hinted at in application No. 67752.

The "square" characteristic of the hysteresis loop of the product made under the patent in suit is the thing which makes that product useful. It is the *sine qua non* of the invention, as so well explained in the application and patent in suit: (Col. 2, l. 39 to 60 of Patent)

> "Magnetic materials having these properties have found particular applications in computer and magnetic memory systems. In general, the function of square loop cores in such a system operates as follows:

> "The core material is magnetized and then excitation removed so that the magnetic state of the core is at retentivity ($B_r$) or at remanence. If a current pulse of short duration and suitable polarity is then applied which is large enough to drive the material in the opposite direction, a voltage output on a separate winding can be taken off due to the change of flux in the core. By arranging a set of these magnetic cores in some kind of array, basic numerical data can be stored for use in mathematical operations. Certain ferromagnetic metals can be used for this purpose if they are very thinly laminated, but the eddy current losses and shielding effects make the response time of these materials relatively long. On the other hand, the 'square loop' ferrites with their high resistivities have shortened the response time of magnetic memory systems by a ratio of about 40 to 1, thus allowing the systems to be operated at much higher speeds of performance."

The plaintiff contends that inasmuch as No. 67752 disclosed Ferramic–34, and inasmuch as one of its characteristics is a square hysteresis loop, that the disclosure in No. 67752 is sufficient to entitle plaintiff to the filing date of that application, October 28, 1948, which is of course before the publications and sales relied on by the defendant. In support thereof the plaintiff relies on the line of cases which hold that a patentee is entitled to the protection of every use to which the invention is susceptible, whether this use was known or unknown to him at the time of filing the application. Illustrative of such cases are the following of the Court of Customs & Patent Appeals: In re Smith (1929), 36 F.2d 302, 17 CCPA 644; In re Downs (1930), 45 F.2d 251, 118 CCPA 803; Swan v. Thompson (Cust. & Pat. App. 1936), 80 F.2d 374; Foss v. Oglesby (1942), 127 F.2d 312, 29 CCPA 1005; and In re Salomon (1943), 136 F.2d 728, 30 CCPA 1189.

But the court is of the view, in the light of the specific language of the patent law (35 U.S.C. 112) requiring the patentee to disclose how to make *"and use"* the invention "in full, clear, concise and exact terms," and in light of patentee's indisputable conduct and statements in the Patent Office as disclosed by the file wrappers of the four applications, that the reasoning of the cases shortly to be mentioned is controlling. Moreover, the cases last above cited, and those with similar holdings, emphasize that the new use entitled to protection either "must result" from the product or that the new use did not involve a new principle or was not an unobvious use.

That it was an "unobvious" use and involved a "new principle," and was not something that "must result" to one skilled in the art is shown by the experimentation conducted by Papian, and the results disclosed in his thesis.

In Application of Stewart (1955), 222 F.2d 747, 42 CCPA 937, the patentee failed "to explicitly disclose in his application the unexpected advantages of the spray," and the court held that the claims relying on that advantage were invalid.

In Abbott v. Coe (1940), 71 App.D.C. 195, 109 F.2d 449, at 450, the court held that an invention is not patentable unless the patent discloses how people can use it, and among other things had the following to say:

"The applicant's use of case-hardening produced an unexpected result which was not mentioned in the application; it permitted the operation of the machine, even at a greatly increased speed, with little lubrication and no spattering of oil. This result was highly useful. But it was not claimed or disclosed, and it cannot retroactively turn the adoption of case-hardening, for other purposes, into invention. Despite contrary intimations in earlier cases like Diamond Rubber Co. v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527, it is now settled that useful innovation without invention is not patentable, and that innovation is not invention unless it 'required some uncommon talent.' Textile Machine Works v. Louis Hirsch Textile Machines, Inc., 1938, 302 U.S. 490, 498–499, 58 S.Ct. 291, 82 L.Ed. 382. It is self-evident that an advantage of which the applicant knew nothing when he adopted case-hardening and made the patent claims now in suit, had no influence upon and no connection with his adoption of case-hardening and his making of these claims. It follows that the advantage of case-hardening in relation to lubrication has no tendency to prove that his adoption of case-hardening and his making of the claims required or showed talent. Moreover, even invention is not patentable unless it is disclosed so that people can use it; and it is not at all clear that what Abbott disclosed would lead anyone, unless by accident, to the use of less oil and so to the avoidance of spattering. 'Accidental results, not intended and not appreciated, do not constitute anticipation.' Eibel Process Company v. Minnesota & Ontario Paper Company, 261 U.S. 45, 66, 43 S.Ct. 322, 329, 67 L.Ed. 523. Nor do they constitute invention."

In Larsen Products Corp. v. Perfect Paint Products (D.C.Md.1961), 191 F. Supp. 303, a dispute arose similar to the one to which this is now narrowed. There was a 1952 application and a 1954 application claimed to be a continuation in part of the 1952 application. The 1954 application described a process for "drying the film" of a plastering bond, and there had been an intervening public use and sale of it. The court pointed out that the 1952 application said nothing about "drying the film" and said at page 316:

"If 'drying the film' is an essential part of the process, as plaintiffs now contend, that element was not disclosed by the 1952 application. * * For the purposes we are now considering, however, the important point is not that the 1952 application was inaccurate, but that in this respect the 1952 application is so different from the 1954 statement and Claims that it did not disclose 'in full, clear, concise and exact terms' the invention claimed by Claims 4 to 8 of the patent in suit."

As above pointed out, the "essential part" of the invention in suit is the square hysteresis loop which was not disclosed in the first application, No. 67752.

■ If there were any doubt about the failure to disclose the patent in suit in the 1948 application, No. 67752, and that the patent in suit is for a different invention than that applied for in No. 67752, then that doubt is dispelled by the statements made by the patentee in the four applications resulting in the patent in suit, and by the conduct of the patentee in endeavoring to secure a patent on the original application long after he had filed the second application wherein the critical disclosures were made which are now embodied in the patent in suit. No quarrel can be had with the legal proposition that a new application can be filed as a continuation in part of a previously pending application if filed before the

patenting, or abandonment or termination of the proceedings on the previous application (35 U.S.C. 120), but the continuing application must be for the same invention and there must be sufficient disclosure in the first application to cover the claims of the second application. Application of Fried (C.C. & PA 1963), 312 F.2d 930; Application of Moreton (C.C. & PA 1963), 312 F.2d 954. Common sense compels the conclusion that the continuing application be disclosed in the first one. Otherwise, persons could obtain the protection of two patents, which would be abortive of the whole concept of protecting inventors, and at the same time giving the public the use of such inventions.

I turn now to the four Patent Office proceedings.

Plaintiff contends No. 67752 was abandoned. But the file wrapper shows it was *not abandoned* but pursued to final rejection long after filing the second application.

The record shows: That all claims were rejected August 2, 1949; that thereafter two additional claims were added and a responsive memorandum filed urging allowance of the original claims; on August 19, 1950 all claims were again disallowed, to which a request for reconsideration and allowance was filed on February 5, 1951 by the patentee; all claims were again rejected on November 17, 1951; on *March 7, 1952* (four months after filing the second application, No. 253779) the *patentee again requested allowance* by the Patent Office *of all claims of No. 67752*, and, among other things, then amended Claim 3 by adding the words "comprising MnO" [13] after the words "fluxing agent" and before the words "adapted to." This is the first time that *manganese oxide* is mentioned

as an ingredient *in any of the claims* of application No. 67752. It is mentioned in the specifications. Thus more than four months after filing the second application, No. 253779, on October 30, 1951, and one month after filing the third application, No. 270351, plaintiff not only requested allowance of *all* the original, plus added claims in No. 67752, but amended Claim 3 to include a material not theretofore mentioned therein. Furthermore, by not withdrawing or abandoning the application *or any part thereof*, plaintiff in effect sought allowance of *all* claims in No. 67752 until their final rejection on November 17, 1952, which was more than one year after filing the second application, No. 253779, and more than nine months after filing the third application, No. 270351.

The foregoing activity of the patentee in actively arguing and pressing for allowance of all claims in No. 67752 after filing the second application, No. 253779 (and the third application, No. 270351), shows conclusively that *plaintiff considered No. 253779* (and No. 270351) *to cover a different invention than plaintiff claimed in No. 67752.*

It would extend this opinion beyond appropriate limits to place the text of application No. 67752 and the second one, No. 253779, alongside one another in parallel columns to show the dissimilarity between the objects of the invention, its description, and the uses. It is sufficient to say that the first application emphasized that the invention related to a composition of matter (later described as ferrites) which had magnetic properties and at the same time had high insulating [14] and dielectric [15] properties. The various stated objects say the same thing in one way or another. From reading the whole file wrapper it is plain that the

---

13. Manganese oxide.

14. An insulating material is defined as one which is a nonconductor; in this case, of electricity.

15. Dielectric is defined in The International Dictionary of Physics and Electronics, Second Edition, as "a material of low direct current electric conductivity and hence a good *insulator*."

820

invention covered a ferrite material which was both magnetic and at the same time had certain properties of resistance to the transmission of electric current comparable to insulation. The emphasis throughout the original application and the subsequent arguments and papers filed by the inventor was on that characteristic. For instance, on page 18 of the file wrapper in 67752, in the argument filed on behalf of the inventor on February 5, 1951, the words "resistance" or "specific resistance" [16] are mentioned eight times. Nothing is said in the original application or any of the papers in that file wrapper which indicates what, if any, the ratio of the residual magnetism ($B_r$ on Fig. 1) was to the maximum flux density ($B_s$ on Fig. 1) of the material described, *and that ratio is what makes the hysteresis loop square or rectangular,* as set out in the second application, No. 253779. The patent describes its importance in Column 2 thereof.[17] As so plainly stated in the second application (now column 1 of the patent in suit), the whole object of the second application was to secure a patent on ferromagnetic materials which "have hysteresis loops of substantially square or rectangular shape" which "have important applications such as in computer or magnetic memory systems." Nothing is said in the first application about any kind of a hysteresis loop, square or otherwise; nothing is said about the use of a hysteresis loop, square or otherwise; nothing is said in the first application about the use of material therein described having important applications for computer or memory systems; nothing is said in the first application or in any of the examples of the material produced, or otherwise, about the following properties which are emphasized as being important properties in a square loop material and which are set out after each example of material or product in the second application and the patent in suit, viz., "saturation flux density ($B_s$)," "Residual magnetism ($B_r$)," the ratio of "$B_r/B_s$," "Coercive force," "maximum permeability," or "initial permeability."

The affidavit of Durr attaching a copy of a work sheet of the inventor showing such properties of Ferramic–34 is of no assistance, for two reasons: first, it is dated in January 1949, three months after No. 67752 was filed, which is evidence that the inventor either did not know

16. In applicant remarks filed Jan. 25, 1950 (p. 13 of the file wrapper), it is stated, "Applicant's product has certain unusual properties among which are its specific resistance."

17. "The terms 'rectangular,' or 'square hysteresis loop' or 'square loop ferrites' require some explanation as these are terms which have been adopted to describe a hysteresis loop which only approaches the square or rectangular shape and the ferrite material which has such a hysteresis loop. The desirable properties which the so-called square loop ferrites exhibit in their hysteresis loops are as follows:

"(1) The
$$\frac{B_r}{B_s}$$
ratio should be as close to unity as possible. If the hysteresis loop were absolutely square or rectangular the ratio would be unity but this ideal ratio is practically unattainable. For purpose of this specification the loop is considered to be rectangular or square if the
$$\frac{B_r}{B_s}$$
ratio is about 0.8 or more.
"(2) The hysteresis loop should be steep, or in other words the differential permeability
$$\frac{dB}{dH}$$
should be large.
"(3) The corners of the hysteresis curve should be sharp, or in other words, there should be a distinct part of sudden directional change in the curve. In use, the sharp cornered materials give an effect similar to the sudden snapping in a mechanical switch and since these ferrites are used to produce effects analogous to switching this property is very important.
"Other desirable properties are that (4) the coercive force be relatively low and (5) that the saturation flux density be relatively high. The saturation flux density of over 1200 gausses is desirable."

those characteristics or properties at the time of filing or that he did not care to disclose such properties to the Patent Office in No. 67752. Further, the ratio between the saturation flux density and residual magnetism shown on the work sheet was only .541 which is an elliptical loop following generally the dotted lines in Fig. 1 of the patent and is not a square loop; all of which supports the conclusion that between January 1949, the date of the work sheet, and Oct. 30, 1951, the date of the *second* application (No. 253779) the square loop properties of a product of the plaintiff, and the use thereof, first became apparent to the plaintiff.

The ratios ($B_r/B_s$) in all the examples of the patent in suit range between a low of .83 and a high of .91, and in the second application (No. 253779) they range between a low of .81 and a high of .83. That ratio, as pointed out in the patent in suit (Column 2),[18] should be as near unity as possible, and as stated in the *second* application, No. 253779, (page 6 of the file wrapper), "the invention provides a novel type of ferromagnetic material * * * having a residual magnetism which is almost equal to the saturation flux density." ($B_r = B_s$)

■ While the arguments filed in the first application several times refer to "unusual" properties, or "unexpected results," the applicant gives no clue as to what they are other than high resistance. "Patents are granted for solving problems and not for stating them." [19] Applicant makes no hint in the first application that one of the unusual properties of the product would be either the square hysteresis loop or its use, so graphically described by applicant in its second application.

Recourse to the patentee's own language confirms that the applicant knew that the first application did not disclose the square loop properties or the use thereof.

For instance, in applicant's second application (No. 253779) it is stated:

"It has *now* been found that certain of such bodies have a very unusual and very interesting property in that they have a rectangular or square hysteresis loop. That is the residual magnetism $B_r$ is almost as high as the saturation flux density $B_s$ and there are two sharp corners in the opposite turning points of the loop. * * * such bodies have important applications such as in computer or magnetic memory systems. These devices *depend upon* square hysteresis loops (of the type defined above) for pulse storage and switching action by means of large, instantaneous changes in magnetic flux *due to the shape of the loop."* (Italics supplied.)

From that language it is apparent that the applicant did not know of the square loop property of ferrites, or did not choose to disclose it in the first application. This is confirmed by the language in the third application, No. 270351, filed February 7, 1952 (one month before asking reconsideration and allowance of all claims in the first application, No. 67752), where applicant stated that the *second* application, No. 253779, *disclosed* the "unusual and interesting property" of a rectangular or square hysteresis loop. Similar language is contained in the fourth application, which is the patent in suit.

■ From the foregoing it follows that the plaintiff did not make the disclosures required by 35 U.S.C. 112 in application No. 67752, which is a material fact, and there is no genuine issue as to it. Hence the defendant is entitled to a summary judgment holding Claims 1 and 3 of the patent invalid for noncompliance with 35 U.S.C. 102(b).

■ Inasmuch as Claims 2 and 4 of the patent in suit are wholly within the boundaries of the description of Claims 1

---

18. See footnote 17.

19. Hamilton Laboratories v. Massengill (6 Cir. 1940), 111 F.2d 584, 585, cert. den. 311 U.S. 688, 61 S.Ct. 65, 85 L.Ed. 444.

and 3,[20] they are likewise invalid for the same reasons. The maxim that the greater includes the lesser is as binding in patent law as in any other.

The findings of fact and conclusions of law necessary to support the summary judgment are set forth in the within memorandum, which makes it necessary only for the defendant to prepare and submit a judgment, without findings of fact and conclusions of law, which counsel will do under the local rules.

April 25, 1961      E. ALBERS-SCHOENBERG      2,981,689

SQUARE LOOP FERRITES

Filed July 12, 1954

EXHIBIT A

20. See the triaxial diagram, Fig. 4, of the first page of the patent in suit, attached as Exhibit A.