**GENERAL FOODS CORPORATION,**
Plaintiff-Appellee,

v.

**PERK FOODS CO., Defendant-Appellant.**

No. 16887.

United States Court of Appeals
Seventh Circuit.

Nov. 17, 1969.

Rehearing Denied Jan. 12, 1970.

Swygert, Circuit Judge, dissented.

Herman J. Gordon, Chicago, Ill., for appellant.

Arthur G. Connolly, Richard E. Cornwell, Wilmington, Del., Sidney S. Gorham, Chicago, Ill., Michael J. Quillinan, White Plains, N. Y., Connolly, Bove & Lodge, Wilmington, Del., for plaintiff-appellee. Phillip B. Bowman, Miller, Gorham, Westcott & Adams, Chicago, Ill., James M. Mulligan, Jr., Connolly, Bove & Lodge, Wilmington, Del., of counsel.

Before SWYGERT and KERNER, Circuit Judges, and WISE, District Judge.*

KERNER, Circuit Judge.

General Foods Corporation (General Foods), a Delaware Corporation, filed suit on October 24, 1964, against Perk Foods Co. (Perk), an Illinois corporation, alleging infringement of its patent for a "Novel Farinaceous Animal Food" known as "Gravy Train." Perk counterclaimed alleging invalidity and non-infringement of plaintiff's patent. The district court entered final judgment for the plaintiff-appellee holding its Letter Patent No. 3,119,691 issued to Ludington, et al., valid and infringed by the defendant-appellant. From this decision defendant appeals.

* Judge Wise is sitting by designation from the United States District Court for the Eastern District of Illinois.

Before 1955, there were two types of prepared dog food sold commercially in the United States: one was the canned dog food variety with a moisture content of 75% and the other was of the "meal" type characterized by small particles with a cereal-like texture, and a moisture content of about 10%. Plaintiff's "Gaines Meal," the largest selling "meal" type product, was composed of small pellets about ¼″ in diameter. The dog owner would sometimes add water, table scraps and table gravy to make it more palatable. However, the meal product would become mushy and stick to the feeding plate when moisture was added.

By 1957, Ralston-Purina Company developed a new type of nutritionally balanced dry dog food which was sold nationally under the name "Purina Dog Chow," and was immediately commercially successful. "Gaines Meal's" share of the market dropped substantially upon the introduction of the "Chow" product. It differed from the "Meal" product in that the particles were larger in size and were light, expanded, and porous. "Chow" was made from a mixture which included some farinaceous starch-containing grain material (e. g., ground corn, ground wheat), which were gelatinized and some proteinaceous material (e. g., meat and bone meal, soy bean meal).

General Foods, seeking to overcome its loss of market, instituted an extensive program to develop a competitive product. This effort resulted in production of two products consisting of a porous expanded fat coated dry dog food, one trademarked "Rally" and the other "Gravy Train." Both products were composed of the same ingredients used in "Chow." These newly developed dry dog foods are processed by extrusion. The extruder receives and processes a farinaceous mixture containing farinaceous and proteinaceous materials and permits the addition of water to the mixture, works the material therein by means of a screw, maintains the mixture under pressure, heats and gelatinizes the mixture and expands the gelatinized mixture upon extrusion from the extruder die. "Gravy Train" and "Rally" are similar except that "Gravy Train" is coated with a gravy former which produces gravy when wetted. A test market of "Gravy Train" and "Rally" was initiated in April, 1959, in two metropolitan areas, resulting in "Rally" being shelved, and "Gravy Train" being produced and marketed nationally since the autumn of 1959.

On December 30, 1959, Hovey Burgess, et al. (Burgess) filed an application for a patent for the product "Rally" and on January 20, 1960, inventors Ludington, Schara and Mohlie filed their patent application for "Gravy Train" which was assigned Serial No. 3,516 ('516). The "Gravy Train" application consisted of ten claims all of which were rejected on July 26, 1960. Claims 1–8 and 10 were rejected because of prior art and claim 9 was rejected as being indefinite since there was no antecedent for "said extrudate." However, the inventors responded to the Patent Office letter and amended the '516 application on January 26, 1961. On October 25, 1961, the Patent Office again rejected claims 1–8 and 10 because of prior art, holding claim 9 allowable. No further communications were initiated in the parent '516 file between the inventors or the Patent Office. Application '516 described "Gravy Train" as being unique because the basic kib is different, the expanded kib is fat coated and a gravy former has been added.

On April 23, 1962 (two days prior to the expiration of the six-month period of abandonment for failure to prosecute an application, 37 C.F.R. § 1.136), the inventors filed a second application for patent, which was assigned Serial No. 189,310 ('310), as a continuation-in-part of parent '516 and parent '516 was then abandoned. An amendment to the '310 application was filed May 17, 1962, accompanied by affidavits, requesting the application be made special because of alleged infringing products actually on the market. An amendment to the application was filed by the petitioners August 16, 1962. On September 25, 1962,

the Patent Office rejected all claims. On November 5, 1962, the Patent Office received a third amendment, which was disposed of by an examiner rejecting claims 5–9, 12 and 14–17 (previously 1–4), finding claims 10, 11 and 13 free of prior art; and further declaring this action final on December 7, 1962. A fourth amendment was filed in the Patent Office on May 27, 1963. An appeal was taken to the Board of Appeals, dated June 6, 1963. A fifth amendment was filed August 19, 1963. The Patent Office allowed claims 14–17 and 5–11 on September 24, 1963. A sixth amendment was filed October 25, 1963, and patent issued January 28, 1964, Patent No. 3,119,691.

It is well settled that the validity of a patent must be presumed from the granting of the patent and the party asserting invalidity has the burden of establishing such invalidity by clear and convincing evidence. 35 U.S.C. § 282; Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 57 S.Ct. 675, 81 L.Ed. 983 (1937); M. B. Skinner Co. v. Continental Industries, Inc., 346 F.2d 170 (10th Cir. 1965); King-Seeley Thermos Co. v. Refrigerated Dispensers, Inc., 354 F.2d 533 (10th Cir. 1965); Copease Manufacturing Co. v. American Photocopy Equipment Co., 298 F.2d 772 (7th Cir. 1961).

We agree with the district court that the patent does not teach or make a "unique" basic kib. The differences between the "Gravy Train" kib and the "Vets Nuggets," "Kasco," and "Dog Chow" kibs are so minor that patentability is not justified. Anyone skilled in the art, as admitted by the General Foods witnesses (Schara, an inventor, and Hudson, an attorney), could determine the technical aspects of various competitive fat and gravy coated dry foods and their manufacturing process, based entirely upon their examination of the products without any direct knowledge of the manufacture of any of them. Both the district court and the Patent Office found that the manufacturing of

an expanded fat coated dog food product did not constitute an invention due to the teaching of prior art patents, Mathews (2,120,138), Chapin (2,489,-267), Graves (2,853,027), Lanz (2,945-764), and Guidarelli (3,014,800) and we agree.

Since we are in agreement with the district court's findings concerning the unpatentability of the manufacturing process of an expanded fat coated dog food product and the lack of uniqueness of the basic kib, we are left with the consideration of patentability of "gravy formers," and "retarded rehydration." General Foods contends that the addition of the gravy former is novel and that the order in which it is applied to the basic kib is patentable.

The district court found that the addition of a gravy former to the basic kib is not obvious, stating "[N]o one ever made a dry gravy forming animal food before plaintiff." The patent examiner, in his communication of July 26, 1960, to the parent '516 application stated:

Claims 1–8 and 10 are rejected as unpatentable over Luft or Evans which disclose the immersing of farinaceous material in melted fat and the addition of flavoring and other food ingredients to produce a product which upon addition to water will make gravy. No patentable distinction is seen in the recital that the fat is in the form of a coating. It would be obvious to control the temperature to produce a coating rather than impregnation. Note that Evans shows a gelatinized starch."

Thickeners have been known and used in prior art, and have been used in the manufacture of human as well as animal foods. The Guidarelli patent describes fat and gums sprayed on pellets. Gums have been known as thickeners over a long period of time. Parent '516 states "preferred gravy formers *may* be gums." [Emphasis added]. CMC is not mentioned as a thickener except when pre-gelatinized starch is employed. Thickeners

(gums, CMC) have been known by those knowledgeable in the art to reduce the rate of absorption of water and had been revealed in prior art patents as early as Luft (1,380,815, June 7, 1921), and followed by Mathews (2,120,138, June 7, 1938); Chapin (2,489,267, Nov. 29, 1949); Evans (2,641,547, June 9, 1953); Graves (2,853,027, Sept. 23, 1958); Lanz (2,945,764, July 19, 1960); Guidarelli (2,014,800, Dec. 26, 1961).

The inventors stated that it is necessary to interpose a layer of fat on the kib and thereafter dust the gravy former on the fat-coated kib. The affidavit of Philip J. Wruk, Laboratory Manager of General Foods, who participated in the experimental work of the development of the patented product, stated "that this experimental work demonstrated that the functions of the two major surface components, i. e., the thickening agent or gravy-forming ingredient and the fat, are not impaired materially by the order in which they are applied to the surface of the individual porous farinaceous particles, nor are the product characteristics relative to gravy-forming abil‑ ity, controlled rate of rehydration, and retention of individual particulate state, materially affected." We must therefore conclude that the sequence of the application of the gravy former and the fat is immaterial to the characteristics of the kib and its reaction upon the addition of water.

■ Perk alleges that the second patent application '310 does not support the claims of the parent '516 because the concept of "retarded rehydration" is not taught in the parent patent and therefore plaintiff is not entitled to the filing date of the parent application. In Railway Company v. Sayles, 97 U.S. 554, 563, 24 L.Ed. 1053 (1878), the Court held:

[I]f the amended application and model, filed by Tanner five years later, embodied any material addition to or variance from the original,—anything new that was not comprised in that,— such addition or variance cannot be sustained on the original application. The law does not permit such enlargements of an original specification, * * *.

The test to be applied is what the parent patent teaches to a man skilled in the art. The court in Indiana General Corp. v. Lockheed Aircraft Corp., 408 F.2d 294 (9th Cir. 1968), held that if the basic compound is the same, a continuation-in-part application may disclose new properties or uses of the compound and still be entitled to the filing date of the original application. Here, while the parent patent '516 did not expressly teach "retarded rehydration" the basic product and process did not change from the parent application and a man skilled in the art should have at least been aware of the qualities of retarded rehydration from experimentation with the product.

■ However, 35 U.S.C. § 120 providing for continuation-in-part applications must be read in conjunction with 35 U.S.C. § 112 which provides:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

In Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938), the Court held that the second application describing the flexible nature of webbing connecting the head and skirt of an automobile piston could not relate back to the first application in which the webbing was described as rigid.

The object of the statute is to require the patentee to describe his invention * * * 'to inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may

be safely used or manufactured without a license and which may not.' Permutit Co. v. Graver Corporation, 284 U.S. 52, 60, 52 S.Ct. 53, 76 L.Ed. 163.

\* \* \* \* \* \*

The antithetical qualities of rigidity and flexibility of a structure are not absolute but relative \* \* \*. If invention depends on emphasis of one quality over the other, \* \* \* the statute requires that emphasis to be revealed to the members of the public, who are entitled to know what invention is claimed. That is not accomplished either by naming a member having inherent antithetical properties or by ascribing to it one property when the other is meant. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 57–58, 59 S.Ct. 8 (1938).

There is no mention of retarded rehydration in the parent '516 application. The specification and claims are replete with the following words, "ready hydratability," "rapid rate of absorption," "liquid absorption is rapid," "rapid rate of absorption" and "hydratable animal food." Nowhere in parent '516 is there the phrase "retarded rehydration" or the slightest inference of retarded rehydration. The use of the words "rapid" and "ready" in parent '516 leave the reader with the impression of a quick, fast, speedy, or accelerated rate of absorption, quite the opposite of retarded rehydration as a characteristic claimed by General Foods.

In our opinion, the parent '516 intended to teach and patent a method of combining fat with a dry gravy forming agent that would, upon the addition of a liquid, produce a gravy on a dry animal food. The inventors were primarily interested in developing a process whereby the preferred dry cereal type animal food of higher nutritional content and superior storing characteristics would overcome the undesirable characteristic of poor palatability by the addition of the gravy former. The parent '516 is replete with the words "gravy-forming" and the concept is contained in each of the ten claims.

In claims 9 and 10 there is a passing mention of the ability of the product "to retain its individual particulate shape on wetting." The Burgess application in which the product "Rally" differed from "Gravy Train" in that no gravy former or thickener was used, contained similar wording: "retention of particle identity during and after hydration." This application was rejected by the Patent Office because of prior art. We conclude that the concept of retarded rehydration was not clearly and concisely described in '516 but instead, the parent application described characteristics which are antithetical to "retarded rehydration."

The claims of retarded rehydration are introduced for the first time with the filing of application '310, April 23, 1962. The variance and change from the claims of gravy formers to retarded rehydration are not comparable and fail to meet the criteria necessary to establish a continuation-in-part. The claim varies from the original application to such a great degree that the filing date of January 20, 1960, cannot be sustained as the filing date for Patent No. 3,119,691.

Since the patent is not entitled to the earlier filing date and "Gravy Train" was first sold in the fall of 1959, the invention was in public use more than one year prior to the filing of the application and is, therefore, unpatentable under 35 U.S.C. § 102. For the foregoing reasons, we reverse.

Reversed.

SWYGERT, Circuit Judge.

I respectfully dissent. In Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 274–275, 69 S.Ct. 535, 537–538, 93 L.Ed. 672 (1949), the Supreme Court emphasized the deference that appellate courts should give to findings made by trial courts in patent cases when there is a conflict in the evidence and the trial court has had the benefit of scientific demonstrations. There the Court said:

> To no type of case is this last clause [Fed.R.Civ.P. 52(a)] more ap-

propriately applicable than to the one before us, where the evidence is largely the testimony of experts as to which a trial court may be enlightened by scientific demonstrations.

\* \* \* \* \* \*

The rule requires that an appellate court make allowance for the advantages possessed by the trial court in appraising the significance of conflicting testimony and reverse only "clearly erroneous" findings.

The trial in the instant case was typical of those referred to by the Supreme Court. The trial lasted more than two and one-half weeks. The transcript of the record is in excess of 1,700 pages and contains more than 150 exhibits. As a preface to his memorandum opinion,[1] which included one hundred twenty-five findings of fact, the judge wrote:

> The testimony having been concerned with technical matters and in many instances conflicting, the following findings are a result of careful consideration of the most credible evidence, both testimonial and documentary, and an evaluation of the courtroom demonstrations and physical exhibits. The findings are in some measure predicated upon an observation of the witnesses and a consideration of their demeanor, competency, and credibility and many of the findings contained herein are adopted from those submitted by the respective parties.

After considering the findings in light of the evidence, I am unable to say that any of the essential findings supporting the validity of the patent and its infringement are clearly erroneous.

The patent in question was granted on the basis of a continuation-in-part application, filed April 23, 1962, which grew out of an original or parent application filed January 20, 1960. Since General Foods' patented product was placed on the market in 1959, the question arises whether the patent is in-valid by reason of 35 U.S.C. § 102(b) which provides that a patent shall not be issued if the invention was in public use or on sale more than a year prior to the date of the application for the patent. Thus the validity of General Foods' patent depends upon whether General Foods is entitled to the filing date of the parent application. Both parties agree that the earlier filing date is applicable only if the claims in the continuation-in-part application are supported by the parent application. Chicago & Northwestern Ry. Co. v. Sayles, 97 U.S. 554, 563–564, 24 L.Ed. 1053 (1878); Application of Moreton, 312 F.2d 954, 50 CCPA 948 (1963); Indiana General Corp. v. Lockheed Aircraft Corp., 249 F.Supp. 809 (S.D.Cal.1966), rev'd on other grounds, 408 F.2d 294 (9th Cir. 1968).

The majority reverses solely on the ground that the claims of the patent are not supported by the parent application. This question was carefully examined by the trial court and a number of findings were made with respect to it. One of the key findings reads:

> The court finds that the language of the patent claiming "retardation of rehydration" is supported by the claims of the parent application. The parent discloses the concept of a base kib which will rapidly absorb water, yet which is characterized by "retention of particle identity during and after hydration, so that the kib does not become mushy or doughy." It is quite clear from a reading of the parent that its objective was to retain the integrity of the particles so as to eliminate mushiness, which inherently implies that the kib retards hydration.

In my opinion a comparison of the parent application with the patent claims supports the judge's observation and also his further statement that "in the context of the language appearing in the parent \* \* \* the parent application intended to teach the concept of retarded hydration even though not using those

---

1. The district court's findings of fact and conclusions of law appear in 157 U.S.P.Q. 14 (1968).

words to do so." This conclusion was based in large part on a further finding: "We are willing to credit the testimony of plaintiff's very able expert, Mr. Harris, that a man skilled in the art would learn the objective of retardation of hydration from the claims of the parent."[2] As the Supreme Court held in the Graver Tank Co. case, 336 U.S. 271, 69 S.Ct. 535, it is the prerogative of the district court and not of this court to assess the relative credibility of witnesses.

As an additional argument, Perk, referring to claim 1 as typical of the patent claims, says that the claim is specifically limited to the inclusion of a "dry gravy-forming and thickening material [which in a coating of is capable of] retarding hydration of the expanded porous structure of the product." Perk maintains that the parent application neither describes nor identifies this critical characteristic. The district court adequately answered this argument. Although the parent application does not contain the word "thickener," the court found that the application "does identify certain 'gums' and names certain materials which it states are gravy formers. Those materials with the exception of corn flower all happen to be thickeners." The court said:

> However, in conjunction with the function of retardation of rehydration, found to be inherent in the language of the parent, the naming of specific materials which are thickeners would make clear to one skilled in the art their function to retard rehydration so as to preserve particle integrity. Accordingly, the Court thinks that the concept of thickening is taught and supported in the language of the parent.

Such a description is clearly sufficient to support the claims of the continuation-in-part application. Indiana General Corp. v. Lockheed Aircraft Corp., 408 F.2d 294 (9th Cir. 1968).

Although other issues pertaining to patentability and infringement are raised in this appeal, I believe that they are adequately treated in the trial court's opinion and were correctly determined. For that reason it would serve no useful purpose to discuss them in this dissent.

---

2. The pertinent testimony of witness Benjamin H. Harris reads:

Q. From your study of the application which led to the patent in suit, Defendant's Exhibit 2, and the parent case, Defendant's Exhibit 3, would you state whether or not there is any essential difference between those two applications and the description of the process for making the product involved in this action?

A. I see no essential difference, and I am of the firm conviction that anyone skilled in the art operating under the teaching of the parent application, can come out with a process and product no different than if he were operating under the teaching of the continuation-in-part application.

Q. When you make that statement, do you have in mind the fact that in one instance there might be the use of the particular words "controlled hydration" or "high water tolerance," and another instance there might be a somewhat different type of word used for the idea?

A. As regards the use of words, my opinion is that what is significant is what the disclosure tells one skilled in the art to do, and how to do it. Words are only a means to an end. The end is, and the question can properly apply generally and here, as between the parent application and the continuation part application. "What does the parent application teach one skilled in the art to do, and how to do it. On the other hand, what does the continuation in part teach one skilled in the art and how to do it."

Now, my position is—I feel fully justified in taking the position without reservation—that anyone knowing nothing about, being totally uninformed, having never seen the continuation in part application, working solely with the teaching of the parent application, as I stated before, would come out with a method and would come out with a product no different than with a full knowledge of the teaching in the continuation in part application.